UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>AES THAMES, L.L.C.,<br><br>Debtor. | Chapter 7<br><br>Case No. 11-10334 (KJC) |
| CHARLES M. FORMAN,<br>Chapter 7 Trustee,<br><br>Plaintiff,<br><br>v.<br><br>P&M BRICK LLC,<br><br>Defendant. | Adversary Proceeding No.:<br>13-50406 (KJC) |

**P&M BRICK LLC'S ANSWERING BRIEF IN OPPOSITION TO TRUSTEE'S MOTION FOR SUMMARY JUDGMENT**

David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 Orange Street, 7th Floor
Wilmington, DE 19801
Telephone:  (302) 573-2525
Facsimile: (302) 573-2524
dfinger@delawgroup.com

NOLAN & HELLER, LLP
Francis J. Brennan, Esq.
*Attorneys for P&M Brick, LLC*
39 North Pearl Street, 3rd Floor
Albany, New York 12207
Telephone: (518) 449-3300
Facsimile: (518) 432-3123
fbrennan@nolanandheller.com

*Attorneys for P&M Brick, LLC*

Dated: September 26, 2014

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................. ii

Statement and Nature and Stage of Proceedings ............................................................1

Summary of Argument. ......................................................................................................2

Statement of Facts................................................................................................................3

Legal Argument ..................................................................................................................13

**POINT I** THERE ARE MATERIAL QUESTIONS OF FACT WITH RESPECT
TO P&M BRICK'S ASSERTED CONDUIT DEFENSE THAT PRECLUDE
SUMMARY JUDGMENT ..................................................................................................13

      A.  Standard for Summary Judgment……………………………………………………13

      B.  P&M was a "Mere Conduit" of Payments from the Debtor …………………….......15

**POINT II** P&M'S EXPERT REPORTS DEMONSTRATE THAT ALL
PAYMENTS FROM THE DEBTOR ARE UNAVOIDABLE AS THEY
WERE ALL MADE IN ACCORD WITH THE ORDINARY COURSE OF
BUSINESS OR CONSISTENT WITH ORDINARY BUSINESS TERMS ...............................21

Conclusion ..........................................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*360Networks (USA), Inc.,* 338 B.R. 194 (Bankr. S.D.N.Y. 2005)................................................ 16

*360Networks (USA), Inc.,* 338 BR 194, citing *Bonded Fin. Servs. v.
European Am. Bank*, 838 F.2d 890 (7th Cir. 1988) ...................................................................... 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .................................................................. 14

*Andreini & Co. v. Pony Express Delivery Svcs., Inc.,* 440 F.3d 1296 (11th Cir. 2006) .......... 18, 20

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) .............................................................................. 14

*Christy v. Alexander and Alexander of New York Inc.
(In re Finley, et al.),* 130 F.3d 52 (2nd Cir. 1997) ....................................................................... 16

*CVEO Corp.,* 327 B.R. 210 (Bankr. D. Del. 2005) ....................................................................... 15, 17

*Daubert v. Merrell Dow Pharm*s.*, Inc.*, 509 U.S. 579 (1993) .................................................... 3, 21

*Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999) ........................................................... 21

*Lambertson Truex, LLC,* 458 B.R. 155 (Bankr. D. Del. 2011)..................................................... 15, 16

*Lenox Healthcare, Inc.,* 343 B.R. 96.(Bankr. D. Del. 2006) ....................................................... 16, 17

*Nordberg v. Societe General (In re Chase & Sanborn Corp.),*
848 F.2d 1196 (11th Cir. 1990) ......................................................................................... 15, 16, 19

**Statutes**

11 U.S.C. §547(b) .................................................................................................................... 1, 3

11 U.S.C. §547(c)(2)(A) ............................................................................................................... 1

11 U.S.C. §547(c)(2)..................................................................................................................... 1, 21

11 U.S.C. §547(c)(2)(B) ............................................................................................................... 1

11 U.S.C. §550............................................................................................................... 1, 3, 16, 19

**Rules**

*Fed.R.Civ.P.* 56(a)*; Fed.R.Bankr.P.* 7056 ................................................................................. 13

*Fed.R.Evid.* 702.......................................................................................................................... 21

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

AES Thames, L.L.C. ("Debtor") filed for relief pursuant to Chapter 11 of the United States Bankruptcy Code (the "Code") on February 1, 2011. The Debtor's case was converted to a proceeding under Chapter 7 by order of this Court entered on January 23, 2012. Charles M. Forman, Esq. ("Trustee") was appointed as Chapter 7 Trustee of the Debtor's case by the Office of the United States Trustee on January 24, 2012, and continues to serve in that capacity.

On January 18, 2013, the Trustee commenced the above-captioned adversary proceeding alleging that P&M received transfers totaling $677,482.63 alleged to be preferential pursuant to 11 U.S.C. §547(b) and sought recovery of such transfers pursuant to 11 U.S.C. §550. Issue was joined by the filing and service of P&M's answer to the complaint on April 10, 2013. P&M asserted affirmative defenses including, inter alia, that the payments to P&M were not avoidable pursuant to 11 U.S.C. §547(c)(2)(A) as they were made in accordance with the ordinary course of business or financial affairs of the Debtor and P&M, or were made in accordance with ordinary business terms within P&M's industry and were not avoidable pursuant to 11 U.S.C. §547(c)(2)(B).

Discovery ensued pursuant to the terms of the Court's scheduling order entered on June 20, 2013. In response to the Trustee's discovery demands, P&M served responses to the Trustee's First Set of Interrogatories and First Request to Produce Documents. As part of his discovery, the Trustee conducted the deposition of Michelle Hueth on November 21, 2013. P&M served its expert's report on the Trustee on January 29, 2014 and an amended expert report on March 5, 2014. Harold A. Schaeffer, P&M's expert, was deposed by the Trustee on March 6, 2014. On June 20, 2014, P&M served served its responses to the Trustee's Request for Admissions, Second Set of Interrogatories and Second Request to Produce Documents. The Trustee deposed Carver Laraway, president of P&M Brick, and Stephen Kelly, an employee of

P&M Brick, on August 13, 2014.

Pursuant to the Court's order entered on May 1, 2014, the Court granted P&M's motion to file and serve an amended answer to the Trustee's Complaint. On May 6, 2014, P&M filed and served its amended Answer asserting as an additional affirmative defense that it was not the initial transferee of the payments from the Debtor but was instead a mere conduit with respect to the payments received from the Debtor and was obligated to pay certain sums of each payment to various suppliers and vendors of the limestone product purchased by the Debtor for use in its power plant.

## SUMMARY OF ARGUMENT

The Trustee's Motion for Summary Judgment (the "Motion") must be denied as there are questions of material fact that support P&M's affirmative defense that it was a "mere conduit" with respect to payments received from the Debtor but from which P&M was obligated to pay various suppliers and contractors that supplied and transported the limestone ordered by the Debtor to its facility in Connecticut. Testimony by Carver Laraway, P&M's president, and Stephen Kelly, P&M's vice president of sales and business development, clearly demonstrated that Mr. Kelly discussed with representatives of Specialty Minerals, Inc ("Specialty"), Carver Sand and Gravel, LLC ("CS&G"), Eastern Barge Services f/k/a White Near Coastal Towing Corp. ("Eastern"), and Mohawk Northeast, Inc. ("Mohawk") the terms and timing of payments to those respective companies and that payment would be made after P&M received payment from the Debtor. None of the representatives of Specialty, Eastern and Mohawk allege in their affidavits[1] submitted in support of the Trustee's Motion that they demanded payment prior to P&M's receipt of funds from the Debtor or that they undertook any collection efforts against

---

[1] The Trustee offers no affidavit in support of its argument on P&M's conduit defense from CS&G, presumably because its managing member, Carver Laraway, is the president of P&M. Regardless of that connection, as shown herein, all of P&M's payments to CS&G were made after P&M received payment from the Debtor.

P&M during the time between P&M's invoices to the Debtor, receipt of payment from the Debtor or eventual payment by P&M to them.  In fact, with the exception of payment to Specialty of the first two invoices and one invoice out of 59 from CS&G attributable to the Debtor's project paid prior to P&M's receipt of funds from the Debtor, all of P&M's payments to Specialty, CS&G, Eastern and Mohawk were made subsequent to P&M's receipt of payment from the Debtor.  Thus, the facts and circumstances of the payments by the Debtor to P&M and, subsequently, from P&M to the suppliers and contractors supplying and transporting the limestone to the Debtor's facility support P&M's defense that it was a "mere conduit" between the Debtor and the other parties involved in the transactions with the Debtor and, therefore, the transfers to P&M are not avoidable pursuant to 11 U.S.C. §550(a).

P&M also opposes that prong of the Trustee's Motion alleging that P&M's expert report is inadmissible with respect to its affirmative defense that all payments received from the Debtor were made within the ordinary course of the Debtor's and P&M's business and  in accord with ordinary business terms within their industry.   In the interests of brevity, P&M incorporates herein its arguments in opposition to the Trustee's Motion to Exclude P&M's Expert Reports.  In short, P&M respectfully submits that its Expert Reports are clearly both relevant and admissible pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993).  Further, P&M's expert opines that all payments made to P&M by the Debtor during the pre-petition preference period pursuant to 11 U.S.C. §547(b) were made within the ordinary business terms of P&M's industry and, accordingly, none of the payments are recoverable by the Trustee from P&M.

### STATEMENT OF FACTS

In or about the fall of 2009, the Debtor solicited bids for the provision of limestone for use in its coal-fired power plant located in Montville, Connecticut.  P&M, in conjunction with Specialty Minerals, Inc. from Adams, Massachusetts, made a joint proposal to the Debtor to

3

provide such materials.  On or about November 23, 2009, the Debtor ordered limestone through P&M essentially as a "test run" to evaluate whether to use P&M to coordinate the supplying of limestone.  On November 23, 2009, Defendant coordinated the shipment of 2,797.21 tons of limestone to Debtor at a total price of $107,692.59. Such shipment was made for purposes of allowing Debtor to test the material produced by Specialty Minerals, Inc. and was shipped by Defendant to Debtor's Uncasville, Connecticut plant.  In connection with this first shipment, Defendant sent Invoice No. 2872, dated November 23, 2009, to Debtor.  Defendant received Debtor's payment therefor in the amount of $107,692.59 on December 31, 2009.

In or around April, 2010, Debtor advised that it intended to purchase its limestone requirements for its Uncasville, Connecticut plant from P&M for a period of one year, likely beginning in late June, 2010.  On or about June 11, 2010, Debtor advised that its Uncasville, Connecticut limestone requirements contract for the period July 1, 2010 through June 30, 2011 had been awarded to the joint proposal submitted by Defendant and Specialty Minerals, Inc.

Thereafter, P&M began coordinating the delivery by truck of limestone from Specialty Minerals, Inc.'s facility in Adams, Massachusetts, to Defendant's facility in Coeymans, New York, in preparation for commencing regular shipments to Debtor's Uncasville, Connecticut plant.

On July 1, 2010, 3,227.02 tons of limestone was shipped to the Debtor at a total price of $104,878.15.  On July 6, 2010, an additional 3,100.74 tons of limestone was shipped to the Debtor at a total price of $100,774.05.  In connection with such shipments, P&M sent Invoice No. 4163, dated July 9, 2010, to Debtor.  P&M received Debtor's payment therefor in the amount of $205,652.20 on August 20, 2010.

On September 15, 2010, an additional 3,060.96 tons of limestone was shipped to Debtor at the total price of $99,481.20. In connection with such shipment, Defendant sent Invoice No.

4712, dated September 30, 2010 to Debtor. On September 17, 2010, an additional 3,329.81 tons of limestone was shipped to the Debtor at the total price of $108,218.83. In connection with such shipment, P&M sent Invoice No. 4722, dated September 30, 2010 to Debtor. P&M received Debtor's payment therefor in the amount of $207,700.03 on November 5, 2010.

On October 26, 2010, an additional 6,317.70 tons of limestone was shipped to the Debtor at the total price of $221,119.50. In connection with such shipment, P&M sent Invoice No. 4990, dated October 30, 2010 to Debtor. P&M received Debtor's payment therefor in the amount of $221,119.50 on December 14, 2010.

On November 16, 2010, an additional 3,564.55 tons of limestone was shipped to the Debtor at the total price of $124,759.25. On November 18, 2010, an additional 3,540.11 tons of limestone was shipped to the Debtor at a total price of $123,903.85. In connection with such shipments, P&M sent Invoice No. 5131, dated November 23, 2010, to Debtor. P&M received Debtor's payment therefor in the total amount of $248,663.10 on December 20, 2010.

P&M's president. Carver Laraway, and Stephen Kelly, P&M's vice president of sales and development, both consistently testified that P&M entered into informal agreements with the various suppliers and barging companies involved in providing and transporting the limestone ordered by the Debtor to its facility in Connecticut. In particular, when questioned by the Trustee, Mr. Laraway testified:

Q. But did P&M Brick pay Specialty Minerals for the limestone?

A. Once we were paid, yes. As a rule, we would invoice- the arrangement with Specialty Minerals was that we would pay upon us getting paid. *See, Exhibit A 37:11-16*[2].

With respect to Eastern (f/k/a White Near Coastal), Mr. Laraway testified:

---

[2] Unless otherwise indicated, references to Exhibits are to those annexed to the Certification of Francis J. Brennan in Opposition to the Trustee's Motion for Summary Judgment and Motion to Exclude Expert Reports, filed contemporaneously herewith.

Q. And to the best of your knowledge, was P&M Brick obligated to pay White Near Coastal for the services it provided?

A. Yes.  I believe it was on the same theory, pay then- when we get paid, everybody gets paid. *Exhibit "A", 42:16-21.*

Discussing P&M's negotiations with the various parties to the transaction, Mr. Laraway testified:

A.  Okay.  Originally, the way that I understand the whole deal was, originally,

they [the Debtor] were buying stone from somewheres [sic] in Virginia somewhere [sic] in that area, and having it barged in.  Our salesman, Steve [Kelly], hit Specialty Minerals, and they said, hey, what can we do together.  They said, well, we got one place they buy our material, but they can't get to Connecticut.  They wouldn't allow them to come in by truck anymore, but if you get this, this would work out well.  So them AES Thames, Steve, one of our other  sales guys, and Specialty Minerals all met at Specialty Minerals and decided to try one of these, for a cost-saving measure, and that's how this whole thing transpired.  *Exhibit "A", 39:13-40:3.*

Continuing his testimony regarding how the relationship with the Debtor and involvement of the suppliers and transporters came about, Mr. Laraway testified:

Q. Are you familiar with Stephen Kelly's negotiations with Tracy White?

A. I know Stephen Kelly's negotiations with Specialty Minerals; not exactly I'm not sure who the exact person was over there he talked to.

Q.  And what did you talk to [sic] about those negotiations?

A. That it was being put together as a team; that we could truck to the port, store it, ship it when they want it.  And it seemed to make sense, being we're a stevedoring company, that it would work.

Q. I draw your attention to interrogatory number 4 and the response.

6

A.  Mm-hmm.

Q.  And what information did you provide?

A.  As in any of the jobs we do, we discuss the pay its going to be paid.  If it's one of our companies and we're supplying it, or anybody else, hey, we pay them when we get paid.  I'm good with that it the terms are 30 to 45 days.  *Exhibit "A", 51:16-52:17.*

Further,

Q.  And who said, here's how we're going to do it, you or Mr. Kelly?

A.  Steven put it together, says hey, this is how we're going to do it, this is how it works, its not a lot of money out of anybody's pocket, and when we get paid, we pay everybody.  And that's usually how it works. *Exhibit "A", 52:24-53:5.*

In response to the Trustee's question regarding invoices from White Near Coastal, the following testimony was elicited:

Q.  So you don't know if the invoices were payable within 45 days of invoice, or payable upon receipt.  Correct?

A.  The way I understood it, we were all on the same page, we were going to be paid- as soon as P&M gets paid, everybody gets paid.  And the term with AES Thames was 30 days, so I believed that we were right in there.  That's the way I understood it.… *Exhibit "A", 58:22-59:5*

Q.  Are you aware or do you have knowledge of the substance of Mr. Kelly's negotiations with Roy White?

A.  Just what I was told.

Q.  And who told you?

A.  That we were going to pay them when we were paid, and it all fell in that 30 to 45 days. *Exhibit "A", 59:12-21.*

Mr. Kelly from P&M was also deposed by the Trustee. Regarding discussions and agreements with respect to the timing of payments to suppliers and barging companies following payment from the Debtor to P&M, Mr. Kelly testified:

Q. And were you involved in the accounts payable component of that transaction [with AES Thames]?

A. Partially.

Q. And what partial involvement did you have?

A. Was to honor that – when we got paid, that we made sure our vendors got paid.

Q. And you were involved in that?

A. Yes- well indirectly, you know, because I made the – I made the agreements with Specialty Minerals.

Q. When you got- so if AES paid an invoice issued from P&M Brick, you would then contact somebody at P&M Brick and say, hey, we have to pay so and so?

A. No, not on every invoice, but as a concept, at the beginning, we would just make sure that, when we got paid, we made sure we paid out vendors. But I didn't have day-to-day- you know, I didn't follow completely, but, you know, in passing, would say, make sure, if we-when we get our money, we make sure we pay our vendors." *Exhibit "B", 12:4-13:2*

On the issue of the timing of payments to White Near Coastal, a barging company transporting the limestone to the Debtor's plant, Mr. Kelly testified in response to the Trustee's question about information Mr. Kelly provided in response to one of the Trustee's interrogatories:

Q. What information did you provide?

A. I was the one-we went to a meeting with AES Thames, with- what's his name there- Tracy. When we went into that meeting, they had asked for 30-day terms, and I negotiated, said,

you know, we're not going to get [paid] for 30 days, it's going to take us 15 days to pay you, so when we get paid-we'll pay you in 45 days, to give time for the check to clear and release the funds. *Exhibit "B", 21:14-23.*

Further, Mr. Kelly testified with respect to discussions with Eastern Barge regarding payment:

Q. So you told him, that's how we're going to pay you?  Did you ask for an agreement, or- where you say, hey, I'm going to get paid in 30 days, I need 45 days to pay you?

A. Yes, it was –yes.  It was in a conversation, hey, here's the deal, we're doing this-you know, these guys are paying me in 30 days, it's going to-you know, we're going to pay you in about 45 days.  And, okay, just make sure I get paid.  *Exhibit "B", 43:10-20.*

Analyzing the dates of payment from AES to P&M and P&M's payments to the suppliers and barging companies shows:

**Specialty Minerals Invoices**

| Date | Invoice | Amount | Date Pd. | Associated AES Thames Inv. | AES Date Pd. |
|------|---------|--------|----------|----------------------------|--------------|
| 7/9/2010 | 477376 | $  5,106.64 | 8/23/2010 | 4712 | 11/5/2010[3] |
| 7/16/2010 | 478487 | $  9,438.32 | 8/23/2010 | 4712 | 11/5/2010 |
| 7/19/2010 | 480137 | $  1,047.76 | 8/23/2010 | 4722 | 11/5/2010 |
| 7/23/2010 | 480146 | $ 10,910.33 | 9/23/2010 | 4722 | 11/5/2010 |
| 7/26/2010 | 481701 | $  5,303.94 | 9/23/2010 | 4722 | 11/5/2010 |
| 8/2/2010 | 482931 | $    891.50 | 10/4/2010 | 4722 | 11/5/2010 |
| 8/13/2010 | 484189 | $  2,596.73 | 10/19/2010 | 4722 | 11/5/2010 |
| **10/1/2010** | **492914** | **$    751.94** | **12/15/2010** | **4990** | **12/14/2010** |
| **10/8/2010** | **494596** | **$  6,458.82** | **12/15/2010** | **4990** | **12/14/2010** |
| **10/15/2010** | **495699** | **$ 19,227.19** | **12/15/2010** | **4990** | **12/14/2010** |
| **10/22/2010** | **497014** | **$ 22,006.83** | **12/23/2010** | **4990** | **12/14/2010** |
| **10/29/2010** | **498333** | **$  6,053.34** | **12/23/2010** | **5131** | **12/20/2010** |

---

[3] Exhibit "K" to the Gutfleish Certification shows payment dates from the Debtor to P&M of "11/8/2010", "12/21/10" and "12/22/2010".    However, Exhibit "D" to the Gutfleish Certification, including copies of P&M's bank account at First Niagara, specifically shows wire transfers from the Debtor to P&M on 11/5/10, 12/14/10 and 12/20/10.  Presumably, the entries of "AES Date Pd." are typographical errors as the bank statements show the dates of receipt of payment from the Debtor to be the dates noted on the within charts.

9

| | | | | | |
|---|---|---|---|---|---|
| 11/5/2010 | 499596 | $ 13,523.63 | 1/26/2011 | 5131 | 12/20/2010 |
| 11/12/2010 | 500768 | $ 18,820.45 | 1/26/2011 | 5131 | 12/20/2010 |
| 11/17/2010 | 502271 | $ 2,355.80 | 1/26/2011 | 5131 | 12/20/2010 |

## Barging Invoices

| Date | Invoice | Amount | Date Pd. | Associated AES Thames Inv. | AES Date Pd. |
|---|---|---|---|---|---|
| 11/4/2010 | 10-1860 | $ 6,433.00 | 4/8/2011 | 4712, 4722 | 11/5/2010 |
| 11/17/2010 | 10-1912 | $ 4,600.00 | 4/18/2011 | 4990 | 12/14/2010 |
| 12/9/2010 | 10-1965 | $ 28,750.00 | 5/23/2011 | 5131 | 12/20/2010 |
| 12/9/2010 | 10-1963 | $ 8,162.00 | 5/23/2011 | 5131 | 12/20/2010 |
| 12/22/2010 | 20100151 | $ 1,001.70 | 3/21/2011 | 5131 | 12/20/2010 |

## CS&G Trucking Invoices

| Date | Invoice | Amount | Date Pd. | Associated AES Thames Inv. | AES Date Pd. |
|---|---|---|---|---|---|
| 7/15/2010 | 176727 | $ 6,309.13 | 10/21/2010 | 4712/4722 | 11/5/2010 |
| 7/12/2010 | 176790 | $ 6,823.52 | 11/8/2010 | 4712/4723 | 11/5/2010 |
| 7/13/2010 | 176796 | $ 5,540.38 | 11/8/2010 | 4712/4724 | 11/5/2010 |
| 7/14/2010 | 176798 | $ 6,730.23 | 11/8/2010 | 4712/4725 | 11/5/2010 |
| 7/15/2010 | 176804 | $ 5,398.06 | 11/8/2010 | 4712/4726 | 11/5/2010 |
| 7/16/2010 | 176806 | $ 6,033.93 | 11/8/2010 | 4712/4727 | 11/5/2010 |
| 7/14/2010 | 176942 | $ 364.77 | 11/8/2010 | 4712/4728 | 11/5/2010 |
| 7/15/2010 | 176943 | $ 365.17 | 11/8/2010 | 4712/4729 | 11/5/2010 |
| 7/19/2010 | 177245 | $ 6,034.74 | 11/8/2010 | 4712/4730 | 11/5/2010 |
| 7/20/2010 | 177268 | $ 4,770.95 | 11/8/2010 | 4712/4731 | 11/5/2010 |
| 7/21/2010 | 177271 | $ 5,314.21 | 11/8/2010 | 4712/4732 | 11/5/2010 |
| 7/22/2010 | 177273 | $ 5,189.24 | 11/8/2010 | 4712/4733 | 11/5/2010 |
| 7/20/2010 | 177274 | $ 352.98 | 11/8/2010 | 4712/4734 | 11/5/2010 |
| 7/23/2010 | 177343 | $ 4,050.55 | 11/8/2010 | 4712/4735 | 11/5/2010 |
| 7/26/2010 | 177494 | $ 351.92 | 11/8/2010 | 4712/4736 | 11/5/2010 |
| 7/27/2010 | 177496 | $ 3,306.15 | 11/8/2010 | 4712/4737 | 11/5/2010 |
| 7/28/2010 | 177498 | $ 2,210.62 | 11/8/2010 | 4712/4738 | 11/5/2010 |
| 7/29/2010 | 177507 | $ 2,349.90 | 11/8/2010 | 4712/4739 | 11/5/2010 |
| 7/30/2010 | 177509 | $ 2,240.72 | 11/8/2010 | 4712/4740 | 11/5/2010 |
| 8/2/2010 | 178244 | $ 1,041.58 | 11/8/2010 | 4712/4741 | 11/5/2010 |
| 8/3/2010 | 178245 | $ 773.00 | 11/8/2010 | 4712/4742 | 11/5/2010 |
| 8/9/2010 | 178271 | $ 347.55 | 11/8/2010 | 4712/4743 | 11/5/2010 |
| 8/10/2010 | 178273 | $ 793.41 | 11/8/2010 | 4712/4744 | 11/5/2010 |

| 8/11/2010 | 178275 | $ | 1,131.55 | 11/8/2010 | 4712/4745 | 11/5/2010 |
|---|---|---|---|---|---|---|
| 8/12/2010 | 178277 | $ | 2,298.62 | 11/12/2010 | 4712/4746 | 11/5/2010 |
| 8/13/2010 | 178279 | $ | 734.05 | 11/11/2010 | 4712/4747 | 11/5/2010 |
| 10/1/2010 | 180322 | $ | 1,528.26 | 12/15/2010 | 4990 | 12/14/2010 |
| 10/4/2010 | 180480 | $ | 2,968.68 | 12/15/2010 | 4990 | 12/14/2010 |
| 10/5/2010 | 180485 | $ | 1,419.07 | 12/15/2010 | 4990 | 12/14/2010 |
| 10/6/2010 | 180497 | $ | 2,591.71 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/7/2010 | 180501 | $ | 2,726.34 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/8/2014 | 180504 | $ | 2,670.01 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/8/2014 | 180516 | $ | 374.58 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/11/2010 | 180796 | $ | 6,438.06 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/11/2010 | 180797 | $ | 830.38 | 12/15/2010 | 4990 | 12/14/2010 |
| 10/12/2010 | 180802 | $ | 4,768.42 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/13/2010 | 180806 | $ | 4,846.21 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/14/2010 | 180810 | $ | 9,298.62 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/15/2010 | 180814 | $ | 12,532.56 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/15/2010 | 180815 | $ | 844.29 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/18/2010 | 181211 | $ | 10,081.54 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/19/2010 | 181214 | $ | 9,938.05 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/20/2010 | 181219 | $ | 10,818.65 | 12/23/2010 | 4990 | 12/14/2010 |
| 10/21/2010 | 181224 | $ | 10,007.63 | 1/5/2011 | 5131 | 12/20/2010 |
| 10/22/2010 | 181231 | $ | 3,537.76 | 1/5/2011 | 5131 | 12/20/2010 |
| 10/25/2010 | 181364 | $ | 3,140.67 | 1/5/2011 | 5131 | 12/20/2010 |
| 10/27/2010 | 181368 | $ | 2,778.40 | 1/5/2011 | 5131 | 12/20/2010 |
| 10/28/2010 | 181372 | $ | 3,250.65 | 1/5/2011 | 5131 | 12/20/2010 |
| 10/29/2010 | 181376 | $ | 408.23 | 1/5/2011 | 5131 | 12/20/2010 |
| 10/26/2010 | 181541 | $ | 2,378.78 | 1/5/2011 | 5131 | 12/20/2010 |
| 11/1/2010 | 181900 | $ | 3,134.04 | 1/5/2011 | 5131 | 12/20/2010 |
| 11/2/2010 | 181903 | $ | 3,537.49 | 1/5/2011 | 5131 | 12/20/2010 |
| 11/3/2010 | 181906 | $ | 8,240.75 | 4/22/2011 | 5131 | 12/20/2010 |
| 11/4/2010 | 181908 | $ | 4,453.46 | 4/22/2011 | 5131 | 12/20/2010 |
| 11/5/2010 | 181910 | $ | 8,236.50 | 4/22/2011 | 5131 | 12/20/2010 |
| 11/8/2010 | 182037 | $ | 4,515.34 | 4/22/2011 | 5131 | 12/20/2010 |
| 11/9/2010 | 182042 | $ | 5,951.79 | 4/22/2011 | 5131 | 12/20/2010 |
| 11/10/2010 | 182044 | $ | 9,612.41 | 4/22/2011 | 5131 | 12/20/2010 |
| 11/11/2010 | 182046 | $ | 9,589.57 | 4/29/2011 | 5131 | 12/20/2010 |

The above charts summarize the payments made by P&M to suppliers and transporters of the limestone purchased by the Debtor that is taken from information provided in *Exhibits "D" and "K"* of the Certification of Harry M. Gutfleish in Support of Trustee's Motion for Summary

Judgment and Motion to Exclude Expert Reports (the "Gutfleish Certification").  The entries noted in bold reflect payments to those parties <u>after</u> P&M received payment from the Debtor.

The analysis shows that Specialty received payment on 8 of its 15 invoices, accounting for $89,198 of the total of $129,493.22 paid to Specialty by P&M subsequent to its receipt of payment from the debtor.  Those payments made by P&M prior to its receipt of payment from the Debtor were in payment of P&M invoices 4712 and 4722.  The remaining payments are attributable to invoices 4990 and 5131, all of which were paid after the Debtor paid P&M.

Payments to the barging companies, White, Mohawk and Eastern, were all made by P&M after it received payment from the Debtor.

Finally, P&M paid 58 of the 59 invoices from Carver for transportation costs related to the limestone purchased by the Debtor after the Debtor paid invoices 4712, 4722, 4990 and 5131 from P&M.

The actual course of dealing between P&M and the suppliers and transporters refutes the affidavits offered by representatives from Mohawk, Specialty Minerals and Eastern, formerly known as White Near Coastal.  In the affidavits proffered by the Trustee (Exhibits L, M, and N to the Gutfleish Certification), Mr. Heinke, president and CEO of Mohawk, and Mr. Esty of Specialty each acknowledged that he was aware the limestone supplied by Specialty and transported by Mohawk was in connection with the AES Thames project.

While Mr. White of Eastern avers that he had no knowledge that the barging services Eastern provided were for the Debtor's project, it is clear from a review of the above information that Eastern was not paid until after P&M received payment from the Debtor.  Moreover, Mr. White does not differentiate or define the invoices noted in his affidavit as being attributable to the Debtor's project or other barging services provided for P&M on behalf of other customers. In fact, based on his representation that he was unaware that Eastern was providing barging

12

services for the Debtor's project, he couldn't possibly make such attribution.  In any case, it is clear from a review of the dates of payment from P&M to any of the barging companies that they all received payment from P&M after it received payment from the Debtor.

Thus, the facts and circumstances of the discussions between P&M and the suppliers and transporters of the limestone to the Debtor clearly supports P&M's position that the transactions for supplying limestone to the Debtor was being treated as a unified transaction with each party playing its respective role, but all being dependent, or largely dependent in the case of Specialty, on P&M's receipt of payment from the Debtor for their respective invoices to be paid.

P&M's expert was also deposed by the Trustee.  P&M has filed opposition to the Trustee's motion to exclude the expert reports (filed simultaneously the Trustee's summary judgment motion) and specifically incorporates herein the facts stated in P&M's opposition thereto.

## ARGUMENT

## POINT I

## THERE ARE MATERIAL QUESTIONS OF FACT WITH RESPECT TO P&M BRICK'S ASSERTED CONDUIT DEFENSE THAT PRECLUDE SUMMARY JUDGMENT

### A.  Standard for Summary Judgment

Federal Rule of Civil Procedure 56, made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Fed.R.Civ.P.* 56(a); *Fed.R.Bankr.P.* 7056. In order to defeat a motion for summary judgment "the nonmoving party [must] go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial'."

*Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (citations omitted). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

P&M has clearly demonstrated that there are material questions of fact regarding the transactions with the Debtor and, in particular, has raised through the documents produced in response to the Trustee's discovery demands and through deposition testimony of P&M's president, vice president of sales and business development and controller that the transactions with the Debtor began with the Debtor having to address a need to obtain limestone from a new source as it was no longer able to have the material delivered by truck from Virginia. As described in Mr. Laraway's testimony, representatives of the Debtor, Specialty and P&M met at Specialty Minerals' offices to develop a strategy to obtain and transport large quantities of limestone to the Debtor's facility in Connecticut other than by truck and in a more cost-effective manner. Viewing the transactions with the Debtor in the holistic manner in which the parties, including the Debtor, arranged, it is clear that the parties recognized the interconnectedness of the arrangement, including payments to the parties throughout the supply chain. Moreover, the facts that P&M paid Specialty for two of the four invoices related to the transaction with the Debtor, all firms providing barging services were paid by P&M after payment was received from the Debtor and all but one invoice for trucking services provided by CS&G was paid after P&M received payment from the Debtor, clearly shows that there are material questions of fact supporting P&M's position that it was a "mere conduit" with respect to payments from the Debtor for payment to the suppliers and transporters that provided services to supply and deliver limestone to the Debtor's plant in Connecticut.

### B. P&M was a "Mere Conduit" of Payments from the Debtor

Bankruptcy Courts in Delaware have "adopted the Seventh Circuit's 'dominion and control' test for whether a party is a transferee within the meaning of §550." *In re Lambertson Truex, LLC,* 458 B.R. 155, 157 (Bankr. D. Del. 2011). Further, "the use of this defense requires that the defendant establish that it lacked dominion and control over the transfer because the payment simply passed through its hands and it had no power to redirect the funds to its own use." *In re CVEO Corp.,* 327 B.R. 210, 216 (Bankr. D. Del. 2005). The court further held that "[t]o have dominion and control means to be capable of using the funds for 'whatever purpose he or she wishes, be it to invest in lottery tickets or uranium stocks'." *Id.* However, "[t]he foregoing is not to say that exercise of any dominion and control over transferred funds precludes an entity from invoking the conduit defense. In the words of the *Bonded Financial* Court, dominion and control is the "*minimum requirement*" for qualifying as an initial transferee." *In re 360Networks (USA), Inc.,* 338 B.R. 194, 203 (S.D.N.Y. 2005)*, citing Bonded Fin. Servs. v. European Am. Bank,* 838 F.2d 890 (7th Cir. 1988). The Seventh Circuit stated in *Bonded* "we think the minimum requirement of status as a 'transferee' is dominion over the money or other asset, the right to put the money to one's own purposes. When A gives a check to B as agent for C, then C is the 'initial transferee'; the agent may be disregarded." *Bonded Fin. Servs.,* 838 F.2d at 893. The Eleventh Circuit, which adopted the "control" test for evaluating fraudulent conveyances, stated that "[t]he test articulated by our court is a very flexible, pragmatic one; in deciding whether debtors had controlled property subsequently sought by their trustees, courts must 'look beyond the particular transfers in questions to the entire circumstance of the transactions'." *Nordberg v. Societe Generale (In re Chase & Sanborn Corp.),* 848 F.2d 1196, 1199 (11th Cir. 1988)*, citing In re Chase & Sanborn Corp.,* 813 F.2d 1177, 1181-1182 (11th Cir. 1987)*.* The Court further held that "[t]he control test, then, as adopted by this circuit,

simply requires courts to step back and evaluate a transaction in its entirety to make sure that their conclusions are logical and equitable.   This approach is consistent with the equitable concepts underlying bankruptcy law." *Nordberg,* 848 F.2d at 1199.

Generally, courts determining whether the conduit defense is applicable are dealing with cases in which the payment from the debtor is in reimbursement of money already advanced by the defendant.   *See, e.g., In re Lambertson Truex, LLC,* 458 B.R. 155 (Bankr. D. Del. 2011)(unauthorized post-petition transfer to defendant was in reimbursement of funds the defendant had paid to the debtor's Paris-based law firm prior to its receipt of the payment from the debtor); *In re Lenox Healthcare, Inc.,* 343 B.R. 96 (Bankr. D. Del. 2006)(transfer not protected because the defendant had paid the suppliers before receipt of the payments from the debtor for the same goods, and the debtor's payment simply reimbursed the recipient for money that it had already advanced on the debtor's behalf); *In re 360Networks (USA), Inc.,* 338 B.R. 194 (Bankr. S.D.N.Y. 2005).

However, being the initial recipient of a transfer from the debtor does not make that recipient, *a fortiori*, the initial transferee to which 11 U.S.C. §550(a) refers.   That is, "[t]he statutory structure confirms that the term 'initial transferee' references something more particular than the initial recipient."   *Christy v. Alexander and Alexander of New York Inc. (In re Finley, et al.),* 130 F.3d 52, 57 (2nd Cir. 1997).   The Second Circuit Court of Appeals agreed with the district court's decision granting partial summary judgment to the defendant, in which the district court stated

> I don't think that Congress intended, from the literal verbiage of the language itself, that the work 'transferee' means the person to whom it is transferred.  I don't think it is an unfair reading of that to say[:] the entity to whom the payment is made … The person who is the recipient is the one to whom the funds ultimately should go…

*Id.*

The Court in *In re CVEO Corp., supra,* denied the summary judgment motion of the trustee appointed under the debtor's confirmed Chapter 11 plan based on its finding that, notwithstanding language in a contract between the debtor and defendant that established a fund maintained by the defendant to cover workers' compensation claims by the debtor's employees, the funds deposited with the defendant were "available to [the Defendant] for [the Defendant's] *unrestricted use for any lawful corporate purpose",* there were material questions of fact regarding the defendant's control over those funds. *Id.* at 217 (emphasis in original).

In this respect, this case is distinguishable from cases such as *In re Lenox Healthcare, Inc.,* 343 B.R. 96 (Bankr. D. Del. 2006). In that case, the Delaware Bankruptcy Court found that the recipient of a payment from the debtor during the preference period could not avail itself of the mere conduit defense because the recipient had paid the suppliers <u>before</u> receipt of the payments from the debtor for the same goods, and the debtor's payment simply reimbursed the recipient for money that it had already advanced on the debtor's behalf. In this case, except in the limited instances noted, P&M did not pay the other parties in the supply chain until <u>after</u> it received the payments in question from the Debtor. Thus, P&M did not fulfill its obligations to Specialty Minerals, Inc., Carver Sand & Gravel LLC, the Port of Coeymans, Eastern Barge or White Near Coastal until receipt of the payments in question from the Debtor. Courts that have found that a payment that is in reimbursement of funds already expended by the recipient note that "dominion and control means to be capable of using the funds for 'whatever purpose he or she wishes, be it to invest in lottery tickets or uranium stocks'." *In re CVEO Corp.,* 327 B.R. at 216*, quoting, Richardson v. I.R.S. (In re Anton Noll, Inc.),* 277 B.R. 875, 879 (B.A.P. 1st Cir. 2002).

The facts of this case are much different. First, the plan to obtain limestone was orchestrated with the direct and initial involvement of the Debtor, along with P&M and

Specialty.  Thus, Specialty knew from the very beginning of the transaction that its limestone product was destined to be transported to, and used by, the Debtor.  Similarly, representatives of Mohawk and Specialty acknowledged in their respective affidavits that each was aware that their products or services were ultimately for the benefit of the Debtor.  While Mr. White from Eastern states that he was not aware of that his company's barging services would be used in connection with the Debtor's project, the fact is that all of Eastern's invoices for barging services transporting the limestone were paid after P&M received payment from the Debtor for those shipments.[4]

In this respect, the facts of this case are more akin to those found in *Andreini & Co. v. Pony Express Delivery Svcs., Inc.,* 440 F.3d 1296 (11th Cir. 2006).  In that case, the debtor's insurance agent received funds from the debtor for payment of insurance premiums.  The agent then paid the insurance carrier despite the fact that the debtor's funds had not yet cleared the agent's account into which the debtor deposited its funds.  Subsequently, the debtor's checks to the agent were returned for insufficient funds.  The debtor then wired funds to the agent to cover the payments that the agent had already made on the debtor's behalf to the carrier.

In its reversal of the District Court's affirmance of the Bankruptcy Court's decision finding the agent liable to the debtor for a preferential transfer, the Eleventh Circuit applied the same "dominion and control" test as has been adopted in the Third Circuit, but found that such test 'is a flexible, pragmatic one; … courts must look beyond the particular transfers in question to the entire circumstance of the transactions'."  *Id.* at 1302*, quoting Nordberg v. Societe*

---

[4] Mr. White avers that Eastern received payment on Invoice 10-1860 dated 11/4/10 on 4/8/10; Invoice 10-1912 dated 11/17/10 on 4/18/10; Invoice 10-1965 dated 12/9/10 on 5/23/10 and Invoice 10-1963 dated 12/9/10 on 5/23/10.  Presumably, the payment dates he notes are incorrect or typographical errors because Eastern could not have possibly been paid for services evidenced by the referenced invoices before the invoices were even issued.  In any case, the above chart shows that payments to barging companies were all made after the Debtor remitted payment to P&M.

*General (In re Chase & Sanborn Corp.),* 848 F.2d 1196 (11th Cir. 1990).  The Eleventh Circuit

recognized that

> [u]nder this test, a recipient of an avoidable transfer is an initial transferee only if
> they exercise legal control over the assets received, such that they have the right
> to use the assets for their own purposes, and not if they merely served as a conduit
> for assets that were under the actual control of the debtor-transferor or the real
> initial transferee.

*Id.* at 1300.

Application of the "flexible, pragmatic" approach the Court enunciated required it to

"step back and evaluate the transaction in its entirety to make sure that their conclusions are

logical and equitable.  This approach is consistent with the equitable concepts underlying

bankruptcy law." *Id.* at 1302.  Applying this approach to the debtor's claim, the Eleventh Circuit

found that the agent did not exercise legal control over the wire transfer it received after it had

made payment to the insurer and, therefore, was not an "initial transferee" for the purposes of 11

U.S.C. §550.

P&M's obligations to the supplier and transporters of the limestone significantly limited

P&M's exercise of control over the funds at issue, such that it cannot be held to be an initial

transferee.  Unlike the cases cited by the Trustee, P&M was not being reimbursed by the Debtor

on account of funds it advanced on the Debtor's behalf to Specialty, CS&G Eastern or Mohawk.

Instead, P&M paid Specialty for two of its four invoices for the Debtor's limestone product, all

of the barging companies' invoices and 58 out of 59 invoices from CS&G for transporting that

product only after receipt of the Debtor's payments.  Mr. Laraway and Mr. Kelly both testified

that payments from the Debtor to P&M would be allocated to the suppliers and transporters.  Mr.

Laraway testified that P&M had contractual obligations to those parties and, as a result, was not

free to use the funds received from the Debtor without being in breach of its obligations to them.

The Debtor's payments to P&M were not in reimbursement of funds already paid to the supplier

and transporters.  They were the funds from which P&M was obligated to pay those parties.  If P&M used those funds for some purpose other than paying the relevant parties, it would have done so at its peril and in breach of its contractual obligations to those parties based on their invoices to P&M.

It is respectfully submitted that the Court should apply a flexible, pragmatic analysis to the facts and circumstances of the transactions and "look beyond the particular transfers in question to the entire circumstance of the transactions". *Andreini & Co.,* 440 F.3d at 1302 (internal citation omitted). In doing so, it is abundantly clear that the entirety of the transactions for the acquisition, transportation and delivery of the limestone was exclusively for the Debtor's benefit.  Mr. Kelly from P&M testified that he was present at a meeting with representatives from the Debtor and Specialty at which the parties devised the plan to provide the limestone needed by the Debtor.  There is no evidence that the Debtor obtained its limestone from any other source and Specialty supplied all of the Debtor's needs for that product.  Specialty was paid by P&M after payment from the Debtor on two of the four invoices related to the Debtor's transaction and those invoices accounted for over 70% of the amounts Specialty was paid for the limestone.  Notwithstanding the averments by representatives of the barging companies regarding their expectation for receipt of payments, all of those firms were paid after P&M received payment from the Debtor.  CS&G, which transported the limestone from Specialty's facility in Massachusetts to P&M's location on the Hudson River for transfer to barges, was paid only after the Debtor's payments to P&M on 58 out of 59 invoices for fees associated with those services.

Based upon the foregoing, it is respectfully submitted that there are questions of material fact with respect to P&M's affirmative defense that it was a "mere conduit" with respect to the

payments received from the Debtor during the preference period that preclude entry of an order

granting the Trustee summary judgment against P&M.

## POINT II

**P&M'S EXPERT REPORTS ARE ADMISSABLE AND DEMONSTRATE THAT ALL PAYMENTS FROM THE DEBTOR ARE UNAVOIDABLE AS THEY WERE ALL MADE IN ACCORD WITH THE ORDINARY COURSE OF BUSINESS AND CONSISTENT WITH ORDINARY BUSINESS TERMS OF P&M**

As set forth more fully in P&M's brief in opposition to the Trustee's motion to exclude

expert reports[5], P&M's expert reports are clearly admissible under Federal Rule of Evidence

702, which provides that an expert's opinion or testimony is admissible if: (a) the expert's

scientific, technical, or other specialized knowledge will help the trier of fact to understand the

evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c)

the testimony is the product of reliable principles and methods; and (d) the expert has reliably

applied the principles and methods to the facts of the case. *Fed. R. Evid.* 702. *See also Daubert v.*

*Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993); *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

137, 141 (1999).  The rejection of expert testimony is "the exception, rather than the rule."

*Advisory Committee Notes, 2000 amendments, Fed. R. Evid.* 702 *("Advisory Committee Notes").*

This is, in part, because the Supreme Court prefers that litigants rely upon "the capabilities of the

jury and of the adversary system generally," rather than "wholesale exclusion" of fairly

supported, relevant testimony by the Court.  *Daubert,* 509 U.S. at 596.   Essentially, expert

evidence is admissible if it assists the trier of fact in understanding or resolving a fact in issue, if

it is reliable and if it is relevant.

By those measures, P&M's expert reports are clearly admissible and, in fact, demonstrate

that all of the allegedly preferential payments made by the Debtor to P&M are unavoidable as

---

[5] P&M's Brief in Opposition to the Trustee's Brief in Support of Motion to Exclude Expert Reports is incorporated herein by reference in support of Point II, herein, and not repeated here in for the sake of brevity.

each was made within the ordinary course of the parties' business and was made in accordance with ordinary business terms pursuant to 11 U.S.C. §547(c)(2).  Mr. Schaeffer examined the payment records with respect to the Debtor's payments to P&M, determined the range of those payments, confirmed the particular industry in which P&M operates, reviewed data produced by RMA (a well-established source for statistical information used in the financial services industry to evaluate and manage risk) to analyze the range of payments within P&M's industry, and applied that payment range analysis to the range of payments made by the Debtor to P&M.

Applying the elements of Rule 702 and the non-exclusive factors announced by the Supreme Court in *Daubert*, along with that Court's caution in *Kumho Tire* that the *Daubert* factors may not apply in every case, it is clear that P&M's expert's reports are admissible and, in fact, demonstrate that all of the payments made by the Debtor to P&M are unavoidable.  The conclusions in the report are reliable based on the wide acceptance of RMA data by bankruptcy courts throughout the country, the acceptance in several of those cases of Mr. Schaeffer as an expert on ordinary course of business analysis, and Mr. Schaeffer's experience in analyzing and applying the RMA data to P&M's invoices to, and payments by, the Debtor.

The expert reports are also relevant to the issue before the Court.  P&M's witnesses testified that P&M is in the stevedoring business.  "Stevedoring" is defined as "to handle (cargo) as a stevedore; also: to load or unload the cargo of (a ship) in port."  *Stevedoring. Merriam-Webster.com. 2014.* http://www.merriam-webster.com. *September 24, 2014.*  Mr. Schaeffer notes in both reports that the "Marine Cargo Handling Industry" (NAICS Code #488320) "comprises establishments primarily engaged in providing stevedoring and other marine cargo handling services (except warehousing)."  *Gutfleish Certification, Exhibit "O", p.5, fn. 3; Exhibit "P", p. 6, fn.4.*  The Trustee concedes that P&M is in the Marine Cargo Handling Industry. In addition, Mr. Schaeffer examined the Crushed and Broken Limestone Mining and

Quarrying Industry and the Brick, Stone, and Related Construction Material Merchant Wholesalers Industry.  In every case, the range of payments by the Debtor fell within the range of payments for each industry: the payment range for the Marine Cargo Handling Industry reflected a low average of 27 days and a high average of 58 days; the range for the Limestone Mining and Qurrying Industry was 26 days from date of invoice while the high average was 50 days from invoice; and the Brick, Stone, and Related Construction Material Merchant Wholesalers Industry, yielded a payment range of 23 days to 52 days.  The payment range for the Debtor's payments to P&M was between 27 days and 45 days; well within the payment range for each of the industries involved in the transaction with the Debtor.

Mr. Schaeffer's forty-plus years of experience in the finance, banking and credit risk industries more than qualifies him to render an expert opinion on the ordinary course of business and ordinary business terms of P&M.  His use of RMA data to analyze the range of payments within the relevant industries is reliable and, based on the information furnished by P&M, Mr. Schaeffer's review of that information as well as the payment records furnished by P&M, clearly shows that his analysis is relevant.  The widespread acceptance of RMA data by bankruptcy courts throughout the country, and the courts' acceptance of Mr. Schaeffer as an expert in preference litigation support both the reliability of his analysis and demonstrate that it will assist the Court in determining a fact at issue.

Based upon the foregoing, and for the reasons stated in P&M's Brief in Opposition to the Trustee's Motion to Exclude Expert Reports, it is respectfully submitted that Mr. Schaeffer's reports are admissible pursuant to Rule 702.  Accordingly, the Trustee's motion for summary judgment must be denied.

## <u>CONCLUSION</u>

Based upon the foregoing and all of the pleadings submitted with respect to the Trustee's

Motion for Summary Judgment, it is respectfully submitted that P&M has demonstrated that the

Trustee's motion should be denied.

Dated:  September 26, 2014                                     Respectfully submitted,

/s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange Street, 7th Floor
Wilmington, DE 19801
Telephone:  (302) 573-2525
Facsimile: (302) 573-2524
dfinger@delawgroup.com

NOLAN & HELLER, LLP
Justin A. Heller, Esq.
Francis J. Brennan, Esq.
*Attorneys for P&M Brick, LLC*
39 North Pearl Street, 3rd Floor
Albany, New York 12207
Telephone: (518) 449-3300
Facsimile: (518) 432-3123
jheller@nolanandheller.com
fbrennan@nolanandheller.com

*Attorneys for P&M Brick, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I, David L. Finger, hereby certify that on this 26th day of September, 2014, I caused a copy of the foregoing document to be served via first class mail, postage prepaid, on the below-listed counsel of record:

Katharine L. Mayer, Esq.
McCarter & English, LLP
P.O. Box 111
Wilmington, DE  19899

/s/ David L. Finger
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange Street, 7th Floor
Wilmington, DE 19801
Telephone:  (302) 573-2525
Facsimile: (302) 573-2524
dfinger@delawgroup.com
