UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>AES THAMES, L.L.C.,<br><br>                                                    Debtor. | Chapter 7<br><br>Case No. 11-10334 (KJC) |
| CHARLES M. FORMAN,<br>Chapter 7 Trustee,<br><br>                                                    Plaintiff,<br><br>                              v.<br><br>P&M BRICK LLC,<br><br>                                                    Defendant. | Adversary Proceeding No.:<br>13-50406 (KJC) |

**P&M BRICK LLC'S OPENING BRIEF
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange Street, 7th Floor
Wilmington, DE 19801
(302) 573-2525
dfinger@delawgroup.com

NOLAN & HELLER, LLP
Justin A. Heller, Esq.
Francis J. Brennan, Esq.
Attorneys for P&M Brick, LLC
39 North Pearl Street, 3rd Floor
Albany, New York 12207
Telephone: (518) 449-3300
Facsimile: (518) 432-3123
jheller@nolanandheller.com
brennan@nolanandheller.com

*Attorneys for P&M Brick, LLC*

Dated: October 2, 2014

## TABLE OF CONTENTS

Table of Authorities ...................................................................................................... ii

Statement and Nature and Stage of Proceedings ...................................................... 1

Summary of Argument. ................................................................................................. 2

Statement of Facts ........................................................................................................ 4

    A.  The Transactions with the Debtor ................................................................. 4

    B.  P&M's Industries .............................................................................................. 6

    C.  Ordinary Business Terms within P&M's Industries .................................... 7

        a.  The Crushed and Broken Limestone Mining and Quarrying
            Industry ..................................................................................................... 8

        b.  The Marine Cargo Handling Industry ................................................... 9

        c.  The Brick, Stone, and Related Construction Material Merchant
            Wholesalers Industry ............................................................................. 10

        d.  Expert's Ultimate Conclusion ................................................................ 10

Argument ...................................................................................................................... 12

POINT I
P&M BRICK IS ENTITLED TO SUMMARY JUDGMENT AND
DISMISSAL OF ALL OF THE CLAIMS ASSERTED IN THE
TRUSTEE'S COMPLAINT BECAUSE ALL OF THE ALLEGED
PREFERENTIAL PAYMENTS WERE MADE WITHIN THE
ORDINARY COURSE OF BUSINESS OF THE PARTIES AND IN
ACCORDANCE WITH ORDINARY BUSINESS TERMS ........................... 12

    A.  Standard for Summary Judgment ................................................................ 12

    B.  The Debtor's Payments to P&M are not Avoidable
        Pursuant to 11 U.S.C. §547(c)(2) ................................................................. 13

Conclusion .................................................................................................................... 18

# TABLE OF AUTHORITIES

**Cases**

*In re Amer. Home Mortgage Holdings, Inc.*, 476 B.R. 124 (Bankr. D. Del. 2012) ..................... 15

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242  (1986) ................................................. 12

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ........................................................... 12

*Daubert v. Merrell Dow Pharms, Inc.,* 509 U.S. 579 (1993) ........................................... 3

*Fiber Lite Corp. v. Molded Acoustical Prod. Inc. (In re Molded Acoustical Prod., Inc.),*
18 F. 3d 217 (3rd Cir. 1994) ........................................................... 3,13, 14, 17

*In re Hechinger Investment Co. of Delaware, Inc.,* 320 B.R. 541 (Bankr. D. Del. 2004) ...... 14, 15

*In re Allegheny Health, Education and Research Foundation,* 292 B.R. 68 (Bankr. W.D.Pa.
2003) ................................................................................................. 14

*In re J. Allan Steel Co.,* 321 B.R. 764 (Bankr. W.D. Pa. 2005) .................................... 16

*In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029 (7th Cir. 1993) .................................... 3, 13

**Statutes**

11 U.S.C. §547(b) ............................................................................. 1, 3

11 U.S.C. §547(c)(2) .......................................................................... 2, 13, 15, 16

11 U.S.C. §547(c)(2)(A) ...................................................................... 1

11 U.S.C. §547(c)(2)(B) ...................................................................... 1, 3, 13

11 U.S.C. § 547(c)(2)(C) ..................................................................... 13

11 U.S.C. §550 ................................................................................ 1

**Rules**

Fed.R.Civ.Proc. 26(e)(1)(A) .................................................................. 1

Fed.R.Civ.Proc. 56(a) ........................................................................ 12

Fed.R.Bankr.Proc. 7056 ....................................................................... 12

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

AES Thames, L.L.C. ("Debtor") filed for relief pursuant to Chapter 11 of the United States Bankruptcy Code (the "Code") on February 1, 2011.  The Debtor's case was converted to a proceeding under Chapter 7 by order of this Court entered on January 23, 2012.  Charles M. Forman, Esq. ("Trustee") was appointed as Chapter 7 Trustee of the Debtor's case by the Office of the United States Trustee on January 24, 2012, and continues to serve in that capacity.

On January 18, 2013, the Trustee commenced the above-captioned adversary proceeding alleging that P&M received transfers totaling $677,482.63 received between November 3, 2010 and February 1, 2011 (the "Preference Period") alleged to be preferential pursuant to 11 U.S.C. §547(b), and sought recovery of such transfers pursuant to 11 U.S.C. §550.  Issue was joined by the filing and service of P&M's answer to the complaint on April 10, 2013.  P&M asserted affirmative defenses including, *inter alia*, that the payments to P&M were not avoidable pursuant to 11 U.S.C. §547(c)(2)(A) as they were made in accordance with the ordinary course of business or financial affairs of the Debtor and P&M, or were made in accordance with ordinary business terms within P&M's industry and were not avoidable pursuant to 11 U.S.C. §547(c)(2)(B).

Discovery ensued pursuant to the terms of the Court's scheduling order entered on June 20, 2013.  In response to the Trustee's discovery demands, P&M served responses to the Trustee's First Set of Interrogatories and First Request to Produce Documents.  As part of his discovery, the Trustee conducted the deposition of Michelle Hueth on November 21, 2013. P&M served its expert's report on the Trustee on January 29, 2014 and an amended expert report on March 5, 2014[1].  Harold A. Schaeffer, P&M's expert, was deposed by the Trustee on March

---

[1] The initial expert report was timely served pursuant to this Court's scheduling order.  Further, Fed.R.Civ.Proc. 6(e)(1)(A) requires a party to supplement any expert report "in a timely manner

6, 2014.  On June 20, 2014, P&M served its responses to the Trustee's Request for Admissions, Second Set of Interrogatories and Second Request to Produce Documents.  The Trustee deposed Carver Laraway, president of P&M Brick, and Stephen Kelly, an employee of P&M Brick, on August 13, 2014.

Pursuant to the Court's order entered on May 1, 2014, the Court granted P&M's motion to file and serve an amended answer to the Trustee's Complaint.  On May 6, 2014, P&M filed and served its amended Answer asserting as an additional affirmative defense that it was not the initial transferee of the payments from the Debtor but was instead a mere conduit with respect to the payments received from the Debtor and was obligated to pay certain sums of each payment to various suppliers and vendors of the limestone product purchased by the Debtor for use in its power plant.

The Trustee has filed a Motion for Summary Judgment and a Motion to Exclude P&M's Expert's Reports.  P&M has opposed those motions and they are pending before the Court.

P&M has filed its own motion for summary judgment.  This is P&M's opening brief in support of that motion.

## SUMMARY OF ARGUMENT

P&M clearly demonstrates that it is entitled to an order granting its motion for summary judgment based on the expert opinion of Harold Schaeffer, president of D&H Credit Services Inc., that all payments received by P&M from the Debtor during the were paid in the ordinary course of business and in accordance with ordinary business terms within P&M's industry. Therefore, all such payments are unavoidable pursuant to 11 U.S.C. §547(c)(2).

---

if the party learns that in some material respect the disclosure or response in incomplete or incorrect."  Such is the case with P&M's supplemental expert report.  In any case, the Trustee was provided with the supplemental report prior to Mr. Schaeffer's deposition and was able to question him regarding its contents and conclusions, and, in fact, did so.

The Third Circuit has held "that 'ordinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C'." *Fiber Lite Corp. v. Molded Acoustical Prod., Inc., (In re Molded Acoustical Prod., Inc.),* 18 F.3d 217, 220 (3rd Cir. 1994), *quoting In re Tolona Pizza Prods. Corp.,* 3 F.3d 1029, 1033 (7th Cir. 1993). Mr. Schaeffer analyzed the range of payments from days from invoice for the industries that included "firms similar in some general way" to P&M, including the Crushed and Broken Limestone Mining and Quarrying Industry (NAICS Code #212312); the Brick, Stone, and Related Construction Material Merchant Wholesalers Industry (NAICS Code #423320); and the Marine Cargo Handling Industry (NAICS Code #488320), all of which relate in "some general way" to the industries in which P&M participates or that were otherwise involved in obtaining and delivering limestone to the Debtor. Mr. Schaeffer concluded that all of the payments by the Debtor to P&M during the Preference Period were made in accord with "ordinary business terms". Therefore, all of the transfers to P&M are unavoidable pursuant to 11 U.S.C. §547(c)(2)(B).

P&M respectfully submits that its Expert Reports are admissible as they are clearly both relevant and reliable pursuant to *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993).[2] Further, P&M's expert opines that all payments made to P&M by the Debtor during the pre-petition preference period pursuant to 11 U.S.C. §547(b) were made within the ordinary business terms of P&M's industry and, accordingly, none of the payments are recoverable by the Trustee from P&M.

---

[2] P&M's arguments in its Brief in Opposition to the Trustee's Motion to Exclude P&M's Expert Reports incorporated herein by reference and are not repeated herein in the interests of brevity and to avoid repetition.

## STATEMENT OF FACTS

**A.  The Transactions with the Debtor[3]**

In or about the fall of 2009, the Debtor solicited bids for the provision of limestone for use in its coal-fired power plant located in Connecticut.  P&M, in conjunction with Specialty Minerals, Inc. from Adams, Massachusetts, made a joint proposal to the Debtor to provide such materials.  On or about November 23, 2009, the Debtor ordered limestone through P&M essentially as a "test run" to evaluate whether to use P&M to coordinate the supplying of limestone.  On November 23, 2009, Defendant coordinated the shipment of 2,797.21 tons of limestone to Debtor at a total price of $107,692.59. Such shipment was made for purposes of allowing Debtor to test the material produced by Specialty Minerals, Inc. and was shipped by Defendant to Debtor's Uncasville, Connecticut plant.  In connection with this first shipment, Defendant sent Invoice No. 2872, dated November 23, 2009, to Debtor.  Defendant received Debtor's payment therefor in the amount of $107,692.59 on December 31, 2009.

In or around April, 2010, Debtor advised that it intended to purchase its limestone requirements for its Uncasville, Connecticut plant from P&M for a period of one year, likely beginning in late June, 2010.  On or about June 11, 2010, Debtor advised that its Uncasville, Connecticut limestone requirements contract for the period July 1, 2010 through June 30, 2011 had been awarded to the joint proposal submitted by Defendant and Specialty Minerals, Inc.

Thereafter, P&M began coordinating the delivery by truck of limestone from Specialty Minerals, Inc.'s facility in Adams, Massachusetts, to Defendant's facility in Coeymans, New York, in preparation for commencing regular shipments to Debtor's Uncasville, Connecticut plant.

---

[3] See, Exhibit "A" to Certification of Francis J. Brennan in Support of P&M Brick's Motion for Summary Judgment (the "Brennan Certification").  Unless otherwise noted, all references to exhibits herein are to those attached to the Brennan Certification.

On July 1, 2010, 3,227.02 tons of limestone was shipped to the Debtor at a total price of $104,878.15.  On July 6, 2010, an additional 3,100.74 tons of limestone was shipped to the Debtor at a total price of $100,774.05.  In connection with such shipments, P&M sent Invoice No. 4163, dated July 9, 2010, to Debtor.  P&M received Debtor's payment therefor in the amount of $205,652.20 on August 20, 2010.

On September 15, 2010, an additional 3,060.96 tons of limestone was shipped to Debtor at the total price of $99,481.20. In connection with such shipment, Defendant sent Invoice No. 4712, dated September 30, 2010 to Debtor.  On September 17, 2010, an additional 3,329.81 tons of limestone was shipped to the Debtor at the total price of $108,218.83.  In connection with such shipment, P&M sent Invoice No. 4722, dated September 30, 2010 to Debtor. P&M received Debtor's payment therefor in the amount of $207,700.03 on November 5, 2010.

On October 26, 2010, an additional 6,317.70 tons of limestone was shipped to the Debtor at the total price of $221,119.50.  In connection with such shipment, P&M sent Invoice No. 4990, dated October 30, 2010 to Debtor.  P&M received Debtor's payment therefor in the amount of $221,119.50 on December 14, 2010.

On November 16, 2010, an additional 3,564.55 tons of limestone was shipped to the Debtor at the total price of $124,759.25.  On November 18, 2010, an additional 3,540.11 tons of limestone was shipped to the Debtor at a total price of $123,903.85.  In connection with such shipments, P&M sent Invoice No. 5131, dated November 23, 2010, to Debtor.  P&M received Debtor's payment therefor in the total amount of $248,663.10 on December 20, 2010.  *See Exhibit "A", Response to Interrogatory No. 14.*

**B.  P&M's Industries**

P&M's representatives all testified that P&M provided stevedoring services to its customers. For example, in answer to the Trustee's question regarding what business P&M is in, Ms. Hueth, P&M's controller, testified

Q. What business is P&M Brick in?

A. It's a port.

Q. It's a port. And what job functions does it give to its customers as a port?

….

A. Stevedoring services, unloading and offloading vessels, barges of other customer's materials generally.  *See Exhibit "B", 22:19-23:4.*

Ms. Hueth further testified:

Q. What services did P&M Brick render to AES Thames?

A. In the case of AES Thames, we provided the stevedoring of the products, so the materials from Specialty Mineral, the trucking from Specialty Minerals to our port, the stevedoring service to load the barge, chartering the barge to go to their plant in Connecticut so we handled coordinating all of, all of that.  *See Exhibit "B": 44:8-16*

In a similar vein, Carver Laraway, P&M's president testified as follows regarding P&M's industries:

Q. And what's the main business of P&M Brick?

A. The main business of P&M Brick is stevedoring, loading and offloading other people's material.

Q. Is the loading and offloading of other people's materials the stevedoring?

A. Yes, sir.  That's what stevedoring is.  *See Exhibit "C", 21:24-22:7.*

Q. So did P&M Brick provide any stevedoring services?

A. That's loading, yes.  The stevedoring is loading.  *See Exhibit "C", 35:17-20.*

Stephen Kelly, P&M's vice president of sales and business development, testified about P&M's line of business as well.

Q. What is the nature of P&M Brick's business?

A. We're stevedores, is our primary, and material—material distribution.

Q. So the primary business is stevedoring?

A. Correct.  *See Exhibit "D", 9:21-10:2.*

The Trustee argues in his summary judgment motion that, accepting that P&M is in the stevedoring industry, the other services provided to the Debtor to obtain and transport the limestone it purchased for its plant were provided by others.  Accordingly, evidence of industry standards within the Marine Cargo Handling Industry is relevant only to that portion of payments from the Debtor attributable to stevedoring services, and P&M is liable for amounts paid over and above those amounts attributable to stevedoring services.

The Trustee incongruently argues in his summary judgment motion that P&M must demonstrate ordinary business terms for industries in which it *does not* participate.  The Trustee cites no basis is law for this position.  Nevertheless, P&M's expert analyzed the ordinary business terms within those other industries associated with the other components of the process of obtaining and delivering limestone to the Debtor.  His expert opinion based on that analysis is that the Debtor's payments to P&M were made consistently with the ordinary business terms within those industries as well.

**C.  Ordinary Business Terms within P&M's Industries**

Mr. Schaeffer utilized data compiled by RMA, which analyzes financial information

provided by RMA's member institutions derived from financials provided to those institutions by their commercial customers and prospective customers. *See Exhibit "E", p. 9.* He noted in his report that the range of days to be paid "equates to the middle quartiles (50%) of all average days to be paid data compiled for this industry." *See Exhibit "F", pp 4, 5, 6.* The effect is that the range of days for payment is a relatively conservative measure that purposely excludes payment ranges that, while within the range of payments, are either substantially above or below the median of the range such that they would be considered "unusual". The range of days to be paid utilized by Mr. Schaeffer intentionally ignores a broader range of days for payment as that range suggests that it would be outside what would constitute acceptable payment terms.

Based on his analysis of P&M's industry- stevedoring; as well as the other industries involved in obtaining and delivering limestone to the Debtor, Mr. Schaeffer concluded that the payments to P&M were made within ordinary business terms for each of those industries.

### a.  The Crushed and Broken Limestone Mining and Quarrying Industry

Utilizing data provided by the Risk Management Association ("RMA"), 100 year-old, non-profit banking association "whose sole purpose is to advance the use of sound risk principles in the financial services industry," *see Exhibit "E", p. 4,* Mr. Schaeffer noted that

> RMA lists, for the first industry data set, the median average days to be paid for the Crushed and Broken Limestone Mining and Quarrying Industry as 39 days, the low average days to be paid as 26 days and the high average days to be paid as 50 days… Data that is outside of this range is considered 'unusual' values (*see* Exhibits A-1, A-2 & A-3 [to the expert report]). *See Exhibit "F", p. 4.*

Mr. Schaeffer opined that "[a]fter reviewing P&M's website and the definition of the industry as well as confirmation from the client, the industry chosen was deemed appropriate for the sales made to the Debtor during the preference period." *See Exhibit "F", p. 3-4.* "The date range covered by these industry numbers was April 1, 2010 to March 31, 2011. The date of the

bankruptcy, February 1, 2011, was covered by the RMA data, as was the entire preference period." *Id. at 4.* Based on this analysis, Mr. Schaeffer concluded that

> during the preference period the actual payment range was 27 to 45 days. Any payment data points (individual invoices paid during the preference period) that fell between or are equal to the average payment range supplied by RMA would be within industry standards for the Crushed and Broken Limestone Mining and Quarrying Industry. After reviewing the records supplied by P&M, the paid invoices fell within the average payment range for P&M's industry (*see* Exhibits #1 and 2 [to the expert report]) leaving a potential amount due the Debtor's estate of $0.00. *Id.*

### b. The Marine Cargo Handling Industry

Analysis of "the average days to be paid for the Marine Cargo Handling Industry (P&M's industry: NAICS Code #488320) reflected a low average of 27 days and a high average of 58 days (*see* Exhibit #3 [to the expert report])." *See Exhibit "F", p.5.* Continuing, Mr. Schaeffer stated that [t]he date range covered by these industry numbers was April 1, 2010 to March 31, 2011. The date of the bankruptcy, February 1, 2011, was covered by the RMA data, as was the entire preference period." *Id.* Mr. Schaeffer noted that

> RMA lists, for the first industry data set, the median average days to be paid for the Marine Cargo Handling Industry as 41 days, the low average days to be paid as 27 days and the high average days to be paid as 58 days…. Data that is outside of this range is considered 'unusual' values (*see* Exhibits A-1, A-2 a& A-3 [to the expert report])." *Id.*

Mr. Schaeffer stated that

> during the preference period the actual payment range was 27 to 45 days. Any payment data points (individual invoices paid during the preference period) that fell between or are equal to the average payment range supplied by RMA would be within industry standard for the Marine Cargo Handling Industry. After reviewing the records supplied by P&M, the paid invoices fell within the average payment range for P&M's industry (*see* Exhibits #1 and 3 [to the expert report] leaving a potential amount due the Debtors' estates of $0.00." *Id. at p. 6.*

### c.   The Brick, Stone, and Related Construction Material Merchant Wholesalers Industry

Again using "statistics that were supplied by RMA" (*Id. at p. 6),* Mr. Schaeffer stated that

"[a]s reported by RMA, the average days to be paid for the Brick, Stone, and Related

Construction Material Merchant Wholesalers Industry (P&M's industry: NAICS Code # 423320)

reflected a low average of 23 days and a high average of 52 days (see Exhibit #4 [to the expert

report]." *Id. at p. 6.*  As with the other industries examined, Mr. Schaeffer stated that "[t]he date

range covered by these industry numbers was April 1, 2010 to March 31, 2011.  The date of the

bankruptcy, February 1, 2011, was covered by the RMA data, as was the entire preference

period." *Id.*

Expanding on his initial comments, Mr. Schaeffer wrote that

> RMA lists, for the first industry data set, the median average days to be paid for
> the Brick, Stone, and Related Construction Material Merchant Wholesalers
> Industry as 38 days, the low average days to be paid as 23 days and the high
> average days to be paid as 52 days… Data that is outside of this range is
> considered 'unusual' values (see Exhibits A-1, A-2 & A-3 [to the expert report]).
> *Id., at pp. 6-7.*

Applying his analysis of the payment range within this industry with the actual payment

range with respect to the payments made by the Debtor to P&M, Mr. Schaeffer opined that

> … during the preference period the actual payment range was 27 to 45 days.  Any
> data points (individual invoices paid during the preference period) that fell
> between or are equal to the average payment range supplied by RMA would be
> within industry standards for the Brick, Stone and Related Construction Material
> Merchant Wholesalers Industry.  After reviewing the records supplied by P&M,
> the paid invoices fell within the average payment range for P&M's industry (see
> Exhibits #1 and 4 [to the expert report]) leaving a potential amount due the
> Debtors' estates of $0.00. *Id. at p. 7.*

### d.   Expert's Ultimate Conclusion

Having analyzed the industries involved in P&M's transactions with the Debtor, Mr.

Schaeffer states

even taking a very conservative view of the objective prong of ordinary course of business defense using only the industry's middle 50% average payment range for both [sic] the Crushed and Broken Limestone Mining, and Quarrying Industry (NAICS Code #212312), Brick, Stone and Related Construction Material Merchant Wholesalers Industry (NAICS Code #432320) and the Marine Cargo Handling Industry (NAICS Code #488320) as listed by RMA as the acceptable payment ranges, I conclude that the invoices at issue in the Adversary Proceeding were paid within this range, leaving a potential preference amount of $0.00 due the Debtors' estates. *Id., at p. 7.*

It should also be noted that there were two transactions (noted above) between the parties that occurred outside of the Preference Period. The first transaction between the parties occurred on November 23, 2009, when P&M coordinated the shipment of 2,797.21 tons of limestone to the Debtor at a total price of $107,692.59 that was shipped to the Debtor's Uncasville, Connecticut plant. In connection with this first shipment, P&M sent Invoice No. 2872, dated November 23, 2009, to the Debtor. P&M received the Debtor's payment therefor in the amount of $107,692.59 on December 31, 2009; a period of 38 days from the date of the invoice to receipt of payment. The second transaction occurred on July 1, 2010, when 3,227.02 tons of limestone was shipped to the Debtor at a total price of $104,878.15 and on July 6, 2010, an additional 3,100.74 tons of limestone was shipped to the Debtor at a total price of $100,774.05. In connection with such shipments, P&M sent Invoice No. 4163, dated July 9, 2010, to Debtor. P&M received Debtor's payment therefor in the amount of $205,652.20 on August 20, 2010; 42 days between the date of the invoice and receipt of payment. *See Exhibit "A", Response to Interrogatory No. 14.* Both of these payments were paid within the range of days to be paid for each of the three industries noted above.

## ARGUMENT

## POINT I

## P&M BRICK IS ENTITLED TO SUMMARY JUDGMENT AND DISMISSAL OF ALL OF THE CLAIMS ASSERTED IN THE TRUSTEE'S COMPLAINT BECAUSE ALL OF THE ALLEGED PREFERENTIAL PAYMENTS WERE MADE WITHIN THE ORDINARY COURSE OF BUSINESS OF THE PARTIES AND IN ACCORDANCE WITH ORDINARY BUSINESS TERMS

### A.  Standard for Summary Judgment

Federal Rule of Civil Procedure 56, made applicable to bankruptcy proceedings by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Fed.R.Civ.P. 56(a); Fed.R.Bankr.P. 7056.* In order to defeat a motion for summary judgment "the nonmoving party [must] go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial'." *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986) (citations omitted).  "Summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Based upon the clear evidence that all of the allegedly preferential payments by the Debtor to P&M were made within the ordinary course of business of the parties and in accordance with ordinary business terms within P&M's industry, P&M has demonstrated that it is entitled to entry of an order granting its motion for summary judgment and dismissing the Trustee's claims in this matter.

**B. The Debtor's Payments to P&M are not Avoidable Pursuant to 11 U.S.C. §547(c)(2)**

11 U.S.C. §547(c)(2) provides that

The trustee may not avoid under this section a transfer-

(2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was –

(A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or

(B) made according to ordinary business terms.

The Third Circuit Court of Appeals provides substantial guidance in evaluating the ordinary course of business terms defense and has noted that "the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy." *Fiber Lite Corp. v. Molded Acoustical Prod. Inc. (In re Molded Acoustical Prod., Inc.),* 18 F. 3d 217, 219 (3rd Cir. 1994). Favorably citing the Seventh Circuit, the Third Circuit Court held that "[w]e believe that the Court of Appeals for the Seventh Circuit delivered the best rendering of text of §547(c)(2)(C)[4] when it held that 'ordinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection (C)." *Id.* at 220, citing, *Tolana Pizza Prods. Corp,* 3 F3d 1029, 1033 (7th Cir. 1993)

---

[4] As a result of the amendments to the Bankruptcy Code pursuant to the Bankruptcy Abuse and Consumer Protection Act of 2005, §547(c)(2)(C) was renumbered as §547(c)(2)(B). The text remains the same.

(emphasis in original).  The Third Circuit, substituting the term "unusual" for "idiosyncratic", noted that this rule does not "imply that the creditor must prove the existence of some single, uniform set of industry-wide credit terms, a formidable if not insurmountable obstacle given the great variances in billing practices likely to exist within the set of markets or submarkets which one could plausible argue comprise the relevant industry."  *Molded Acoustical Prod. Inc.,* 18 F.3d at 224.

 The Third Circuit also recognized the difficulty defendants in preference actions might have in identifying which industry's standards are the appropriate measure for determining "ordinary business terms".  The Court held that "[t]he Seventh Circuit's approach, and the approach we will employ, though still requiring that the creditors make some showing of an industry standard, is quite accommodating about what the proper industry is, ameliorating this sometimes intractable problem."  *Id.* at 224.  The Court noted "that our interpretation only mandates that the creditor ensures its credit terms comport with some reasonable relevant industry's norms." *Id.* at 226.

Courts also consider "the consistency of transactions between the debtor and creditor before and during the preference period."  *In re Hechinger Investment Co. of Delaware, Inc.,* 320 B.R. 541, 548 (Bankr. D. Del. 2004).  Those factors include "(1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfer was in an amount more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and whether the creditor did anything to gain an advantage (such as gain additional security) in light of the debtor's deteriorating financial condition."  *Id.,* citing *In re Allegheny Health, Education and Research Foundation,* 292 B.R. 68 (Bankr. W.D. Pa. 2003).

The Bankruptcy Court in *Hechinger*, applying the Third Circuit's definition of "ordinary business terms" to the transactions before it, noted that the parties' "entire business relationship … extended over a period of approximately 10 months." *Id.* at 545. Applying the factors noted to the evidence of the ordinary business terms within the defendant's industry, the bankruptcy court found the payments to be unavoidable. The court, quoting from *Molded Acoustical*, noted that

> [o]n the one hand the preference rule aims to ensure that creditors are treated equitably, both by deterring the failing debtor from treating preferentially its most obstreperous or demanding creditors in an effort to stave off a hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the debtor. On the other hand, the ordinary course exception to the preference rule is formulated to induce creditors to continue dealing with a distressed debtor so as to kindle its chances of survival without a costly detour through, or a humbling ending in, the sticky web of bankruptcy.

*In re Hechinger Inv. Co. of Delaware, Inc.*, 320 B.R. at 551, citation omitted.

In *In re Amer. Home Mortgage Holdings, Inc.*, 476 B.R. 124 (Bankr. D. Del. 2012), the court had to determine whether transfers by the debtor to one of its creditors with "a limited history of dealings of only eight (8) months" were nevertheless unavoidable under 11 U.S.C. §547(c)(2). The court analyzed the evidence presented that showed a range of payments during the preference period from date of invoice of between 34 and 62 days. The pre-preference period payment history showed a payment range from date of invoice to date of payment of between 7 days and 67 days. The court noted that the defendant did not apply any undue pressure on the debtor to spur payment and that the payments made were in the amounts of the invoices, without any reduced or additional payments made on account of any other invoices. The defendant's expert also testified that the payments received were made within the ordinary course of business of the creditor. The court found that all of the transfers were unavoidable based on the fact that the defendant had established the ordinary course of business terms for

payment within its industry notwithstanding the relatively short duration of its relationship with the debtor.  The court noted that "the standard set by the Third Circuit in *Molded Acoustical Products* requires evidence only of the range of terns that encompass practices similar in a general way to the defendant'."  *Id.* at 138.  *See also In re J. Allan Steel Co.,* 321 B.R. 764 (Bankr. W.D. Pa. 2005) (finding that the creditor established the range of payment terms within the industry, the court considered the length of the business relationship of the parties, the stability of that relationship and the range of payments from invoice date to payment date, and held that transfers were unavoidable pursuant to 11 U.S.C. §547(c)(2)).

Applying the same rationale to the facts of this case clearly demonstrates that P&M is entitled to an order granting the within motion for summary judgment and dismissing the Trustee's claims in their entirety.  P&M's witnesses all testified that P&M is in the stevedoring industry.  "Stevedoring" is defined as "to handle (cargo) as a stevedore; also: to load or unload the cargo of (a ship) in port."  *Stevedoring.  Merriam-Webster.com. 2014.  http://www.merriam-webster.com.  September 24, 2014.*  The Marine Cargo Handling Industry "comprises establishments primarily engaged in providing stevedoring and other marine cargo handling services (except warehousing)."  *See Exhibit "F", p. 5, n.3.*

The business relationship between P&M and the Debtor covered approximately 15 months from November 23, 2009 to the filing date of the petition on February 1, 2011, and approximately 13 months from the date of P&M's first invoice to the Debtor on November 23, 2009 through the last payment received from the Debtor on December 20, 2010.  Payments from the Debtor to P&M during the pre-preference period were made within 38 to 42 days from date of invoice to date of payment.  P&M's expert established that the range of days to be paid from date of invoice to date of payment in the Marine Cargo Handling Industry was between 27 to 58

days with a median of 41 days.  There is absolutely no evidence that P&M applied any undue pressure or collection activity against the Debtor with respect to payments made either during the pre-preference period or the Preference Period.

The actual payment range for payments by the Debtor to P&M during the Preference Period was made between 27 and 45 days from the date of invoice.  The Debtor paid only the amount due with respect to each invoice from P&M, and never "shorted" payments or paid additional sums on any of P&M's invoices, and there was no change in the payment method of any of the payments made during the Preference Period.

Application of the Third Circuit's holding in *Molded Acoustical Products, Inc.* with respect to P&M's asserted defense that all of the transfers to it by the Debtor during the Preference Period are unavoidable as they were made within the ordinary course of business of the parties and in accordance with ordinary business terms of P&M's industry, is amply supported by the facts and circumstances of the transactions between the Debtor and P&M and supports a finding that dismissal or the Trustee's claims in this action is warranted.

Further, to the extent that the Court considers the other industries involved in obtaining and transporting the limestone to the Debtor's facility notwithstanding that P&M does not participate in those industries, Mr. Schaeffer's expert opinion clearly shows that all of the payments made to P&M during the Preference Period clearly demonstrates that the range of payments to P&M is consistent with the payment range of days to pay within those industries as well.

## <u>CONCLUSION</u>

Based upon the foregoing and all of the pleadings submitted with respect to P&M's Motion for Summary Judgment, P&M has demonstrated that entry of an order granting its motion and dismissing the Trustee's Complaint in its entirety is warranted.

Dated:  October 2, 2014                    Respectfully submitted,


*/s/ David L. Finger*_____
David L. Finger. (DE Bar ID #2556)
One Commerce Center
1201 N. Orange Street, 7th Floor
Wilmington, DE 19801
(302) 573-2525
dfinger@delawgroup.com

NOLAN & HELLER, LLP
Justin A. Heller, Esq.
Francis J. Brennan, Esq.
39 North Pearl Street, 3rd Floor
Albany, New York 12207
Telephone: (518) 449-3300
Facsimile: (518) 432-3123
jheller@nolanandheller.com
fbrennan@nolanandheller.com

*Attorneys for defendant P&M Brick, LLC*

105972

## <u>CERTIFICATE OF SERVICE</u>

I, David L. Finger, hereby certify that on this 2nd day of October, 2014, I caused a copy

of the foregoing document to be served via first class mail, postage prepaid, on the below-listed

counsel of record:

Katharine L. Mayer, Esq.
McCarter & English, LLP
P.O. Box 111
Wilmington, DE  19899

<div style="margin-left: 50%;">

<u>/s/ David L. Finger         </u>
David L. Finger (DE Bar ID #2556)
Finger & Slanina, LLC
One Commerce Center
1201 N. Orange Street, 7th Floor
Wilmington, DE 19801
Telephone:  (302) 573-2525
Facsimile: (302) 573-2524
dfinger@delawgroup.com

</div>