## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In Re: | ) | |
| | ) | |
| AES THAMES, L.L.C., | ) | Chapter 7 |
| | ) | |
| Debtor | ) | Case No. 11-10334 (KJC) |
| | ) | |
| | ) | |
| CHARLES M. FORMAN, | ) | |
| Chapter 7 Trustee, | ) | |
| | ) | |
| Plaintiff, | ) | Adv. Case No. 13-50406 (KJC) |
| | ) | (D.I.  59, 61, 68) |
| v. | ) | |
| | ) | |
| P&M BRICK LLC, | ) | |
| | ) | |
| Defendant. | ) | |

### OPINION[1]

**BY:   KEVIN J. CAREY, UNITED STATES BANKRUPTCY JUDGE**

<u>Background</u>

AES Thames, L.L.C. (the "Debtor") owned and operated a coal-fired power plant located

in Montville, Connecticut.  P&M Brick, LLC ("P&M Brick") supplied limestone to the Debtor.

On February 1, 2011 (the "Petition Date"), the Debtor filed a petition for relief under chapter 11

of the Bankruptcy Code.   On January 23, 2012, the Debtor's case was converted to chapter 7.

Charles M. Forman was appointed as Chapter 7 Trustee (the "Trustee") on January 24, 2012, and

continues to serve in that capacity.

On January 18, 2013, the Trustee filed an adversary complaint to avoid and recover four

prepetition payments from the Debtor to P&M Brick, totaling $677,482.63, as preferential

---

[1] This Opinion constitutes the findings of fact and conclusions of law, as required by Fed. R. Bankr. P. 7052. This Court has jurisdiction to decide this matter pursuant to 28 U.S.C. § 157 and § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F).

transfers under Bankruptcy Code §§ 547(b) and 550.  P&M Brick filed an answer asserting,

among other things, the "ordinary course of business" affirmative defense under Bankruptcy

Code § 547(c)(2).  The parties engaged in discovery.  On January 28, 2014, P&M Brick served

the Trustee with a report by Harold A. Schaeffer in support of its ordinary course of business

defense.  On March 5, 2014, P&M Brick served the Trustee with a second report by Mr.

Schaeffer, also in support of its ordinary course of business defense.

On May 1, 2014, the Court granted P&M Brick's motion to amend its answer to assert a

"mere conduit" affirmative defense, alleging that P&M Brick "was not an initial transferee" of

the transfers because it was "acting as an agent on behalf of the suppliers and shippers."[2]  In

particular, the Amended Answer (Adv. D.I. 51) avers that P&M Brick was a mere conduit for the

following entities:

- Specialty Minerals, Inc., which provided the minerals and/or specialty stone materials shipped to the Debtor or obtained on the Debtor's behalf.

- CS&G Trucking, which provided trucking services for transportation of the minerals and/or specialty stone materials shipped to or obtained on the Debtor's behalf.

- Eastern Barge Services (f/k/a White Near Coastal Towing Corp.) and Mohawk Northeast, Inc., which provided barging services for transportation of the minerals and/or specialty stone materials shipped to or obtained on the Debtor's behalf.[3]

The Trustee filed a Motion for Summary Judgment (Adv. D.I. 59) (the "Trustee's

Summary Judgment Motion), as well as a Motion to Exclude P&M Brick's Expert Reports (Adv.

D.I. 61) (the "Trustee's Motion to Exclude Reports").  P&M Brick opposes these motions and

filed its own Motion for Summary Judgment (Adv. No. 68) ("P&M Brick's Summary Judgment

Motion") on its ordinary course of business defense.

---

[2] Amended Ans., Adv. D.I. 51, ¶¶ 38-39.
[3] *Id.* at ¶¶ 30-34.

For the reasons stated below, I conclude as follows: (1) the Trustee's Summary Judgment Motion will be granted, in part, rejecting P&M Brick's mere conduit defense, but denied, in part, as to the Trustee's request for judgment to be entered in his favor; (2) the Trustee's Motion to Exclude Reports will be denied; and (3) P&M Brick's Summary Judgment Motion will be granted as to P&M Brick's ordinary course of business defense, and judgment will be entered in favor of P&M Brick.

### Undisputed Facts[4]

P&M Brick supplied limestone to the Debtor for use in connection with its operations. During the 90 days prior to the Petition Date (the "Preference Period"), the Debtor paid the following invoices (the "Transfers"):[5]

| Invoice Number | Invoice Date | Invoice Amount | Payment Date |
|---|---|---|---|
| 4712 | 9/30/2010 | $108,218.83 | 11/5/2010 |
| 4722 | 9/30/2010 | $ 99,481.20 | 11/5/2010 |
| 4990 | 10/30/2010 | $ 221,119.50 | 12/14/2010 |
| 5131 | 11/23/2010 | $ 248,663.10 | 12/20/2010 |

P&M Brick described the amount of limestone shipped to the Debtors in connection with the Transfers as follows:

- For invoices 4712 and 4722 paid on 11/5/2010 (total $207,700.03), P&M Brick shipped 3,060.96 tons on or about 9/15/2010, and 3,329.81 tons on or about 9/17/2010;

---

[4] In support of their respective summary judgment motions, the parties each submitted their own Statements of Fact. The facts in this section are not in dispute.

[5] Copies of the invoices (the "Invoices") are attached as Exhibit C to the Certification of Harry M. Gutfleish In Support of the Trustee's Motion for Summary Judgment and Motion to Exclude Expert Reports (Adv. D.I. 63) (the "First Gutfleish Certification"). Copies of P&M Brick's bank statements showing payment of the Invoices by the Debtor's wire transfers are attached as Exhibit D to the First Gutfleish Certification.

- For invoice 4990 paid on 12/14/2010 ($221,119.50), P&M Brick shipped 6,317.70 tons on or about 10/26/2010; and

- For invoice 5131 paid on 12/20/2010 ($248,663.10), P&M Brick shipped 3,564.55 tons on or about 11/16/2010, and 3,540.11 tons on or about 11/18/2010.[6]

In response to the Trustee's interrogatory asking P&M Brick to identify the goods and services rendered to the Debtor in consideration for the Transfers, P&M Brick wrote, in part:

> In general, P&M Brick, LLC supplied de-dusted and/or washed limestone to Debtor. In addition to supplying limestone, P&M Brick, LLC performed a variety of services, including purchasing such limestone from producers; arranging for delivery by truck of such limestone to the P&M Brick, LLC facility in Coeymans, New York; unloading, stockpiling, and storing such limestone at the P&M Brick, LLC facility in Coeymans, New York; loading such limestone on barges; and coordinating shipment by barge of such limestone to the Debtor's facility in Uncasville, Connecticut.[7]

### Standard of Review

Rule 56 of the Federal Rules of Civil Procedure, made applicable by Federal Rule of Bankruptcy Procedure 7056, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[8] At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.[9]

The moving party bears the burden of establishing the absence of a genuine dispute as to a material fact.[10] "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the

---

[6] First Gutfleish Certification, Ex. F, Ans. to interrogatory 10.
[7] First Gutfleish Certification, Ex. F, Ans. to interrogatory 10.
[8] Fed. R. Civ. P. 56(a).
[9] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).
[10] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).

pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material

fact."[11] When the nonmoving party bears the burden of persuasion at trial, the moving party

"may meet its burden . . . by showing that the nonmoving party's evidence is insufficient to carry

that burden."[12]

Once the moving party has carried its initial burden, the opposing party "must do more

than simply show that there is some metaphysical doubt as to the material facts."[13] Summary

judgment cannot be avoided by introducing only "a mere scintilla of evidence,"[14] or by relying

on "conclusory allegations, improbable inferences and unsupported speculation."[15] "Brash

conjecture coupled with earnest hope that something concrete will materialize, is insufficient to

block summary judgment."[16]

Substantive law determines which facts are material; "[o]nly disputes over facts that

might affect the outcome of the suit will preclude summary judgment."[17] Moreover, a dispute

over a material fact is genuine "if the evidence is such that a reasonable jury could return a

---

[11] *Celotex.*, 477 U.S. at 323, 106 S.Ct. at 2553.

[12] *Foulk v. Donjon Marine Co., Inc.*, 144 F.3d 252, 258 n.5 (3d Cir. 1998) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

[13] *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

[14] *Sarko v. Penn-Del Directory Co.*, 968 F.Supp. 1026, 1031 (E.D. Pa. 1997) (citation omitted), *aff'd* 189 F.3d 464 (3d Cir. 1999).

[15] *J.Geils Band Emp. Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1251 (1st Cir. 1996) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)).

[16] *J. Geils Band*, 76 F.3d at 1251 (quoting *Dow v. United Bhd. of Carpenters*, 1 F.3d 56, 58 (1st Cir. 1993)).

[17] *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

verdict for the nonmoving party."[18] The Court must resolve all doubts and consider the evidence

in the light most favorable to the nonmoving party.[19]

## Discussion

A bankruptcy trustee may avoid a debtor's prepetition transfer of a debtor's property if

the following elements of Bankruptcy Code § 547(b) are met: (1) the transfer was made to or for

the benefit of a creditor, (2) on account of a preexisting debt, (3) while the debtor was insolvent,

(4) within 90 days of the debtor's bankruptcy filing, and (5) the transfer enabled the creditor to

receive more than it otherwise would in a hypothetical chapter 7 case.[20] "The preference rule

aims to ensure that creditors are treated equitably, both by deterring the failing debtor from

treating preferentially its most obstreperous or demanding creditors in an effort to stave off a

hard ride into bankruptcy, and by discouraging the creditors from racing to dismember the

debtor."[21]

The Bankruptcy Code also provides for certain defenses to preference suits.[22] The goal is

not to disturb normal creditor relationships, "but to derail unusual ones which threaten to

heighten the likelihood of the debtor filing for bankruptcy at all and, should that contingency

materialize, to then disrupt the paramount bankruptcy policy of the equitable treatment of

---

[18] *Id. See also Delta Mills, Inc. v. GMAC Comm. Fin., LLC (In re Delta Mills, Inc.)*, 404 B.R. 95, 105 (Bankr. D. Del. 2009) (An issue is genuine "when reasonable minds could disagree on the result.").

[19] *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2505 ("[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[20] 11 U.S.C. § 547(b).

[21] *Fiber Lite Corp. v. Molded Acoustical Prods., Inc. (In re Molded Acoustical Prods., Inc.)*, 18 F.3d 217, 219 (3d Cir. 1994) *superseded, in part, by statute,* Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, P.L. 109-8, Title IV, §409, 119 Stat 23 (Apr. 20, 2005). Despite the later amendment to § 547, the Third Circuit's analysis upon which I rely for present purposes remains vital, persuasive and controlling.

[22] *Molded Acoustical*, 18 F.3d at 219.

creditors."[23] Even if a transfer satisfies all the elements of Section 547(b), it nevertheless might be protected. Here, it is undisputed that the Trustee has established a prima facie case for avoidance of the four Transfers. At issue is whether P&M Brick has a viable mere conduit defense or ordinary course of business defense based, in part, on expert testimony.

1. Mere Conduit Defense

P&M Brick asserts the affirmative defense that it acted as a "mere conduit" with respect to the payments in question and that it is not a transferee. Under Bankruptcy Code § 550(a), a trustee may recover transfers avoided under §§ 547, 548, and 549 from "the initial transferee of such transfer[s] or [from] the entity for whose benefit such transfer[s were] made[.]"[24] Thus, a defense to avoidance is available to those entities that are "mere conduits" of the avoided transfers.[25]

To be a "mere conduit," a defendant must "establish that it lacked dominion and control over the transfer because the payment simply passed through its hands and it had no power to redirect the funds to its own use."[26] Where a transferee is "not under any contractual or other

---

[23] Id. at 224.

[24] 11 U.S.C.A. § 550(a).

[25] See, e.g., Broadway Advisors, LLC v. Hipro Electronics, Inc. (In re Gruppo Antico, Inc.), 359 B.R. 578, 584-88 (Bankr. D. Del. 2007); Argus Mgmt. Group v. GAB Robins, Inc. (In re CVEO Corp.), 327 B.R. 210 (Bankr. D. Del. 2005); Official Comm. of Unsecured Creditors v. Guardian Ins. 401 (In re Parcel Consultants, Inc.), 287 B.R. 41 (Bankr. D. N.J. 2002).

[26] CVEO Corp., 327 B.R. at 216. See also Golden v. The Guardian (In re Lenox Healthcare, Inc.), 343 B.R. 96, 103 (Bankr. D. Del. 2006) (citing Jet Fla., Inc. v. Airlines Clearing House, Inc. (In re Jet Fla. Sys., Inc.), 69 B.R. 83, 84-85 (Bankr. S.D. Fla.1987) (finding that a clearinghouse used to settle and reconcile accounts between air carriers was a mere conduit rather than an initial transferee with respect to settlement payments received from the debtor for the purpose of disbursement); Nedlloyd, Inc. v. Universal Trading Corp. (In re Black & Geddes, Inc.), 59 B.R. 873, 874-75 (Bankr. S.D.N.Y. 1986) (concluding that a collection agency was merely a conduit, collecting payments due to its principal; Kaiser Steel Res., Inc. v. Jacobs (In re Kaiser Steel Corp.), 110 B.R. 514, 520-21 (D. Colo. 1990) (holding stock broker a conduit for stock redemption payments it received on behalf of its customers); [Official Comm. of Unsecured Creditors v. U.S. Dep't of Labor,] (In re Dairy Stores), 148 B.R. [6], at 9 (determining that the Department of Labor, which brought suits to recover back wages for employees, enjoyed no benefit from the recoveries and merely acted as a custodian)).

obligation to use [transferred funds] for the benefit of [third parties,]" but rather, may use the

funds freely, it is not a "mere conduit." [27]

P&M Brick alleges it acted as an agent and a mere conduit for payments owed to third

parties in the supply chain who made the delivery of limestone possible. Specifically, P&M

Brick claims that it was acting as an agent for the supplier and shippers when it accepted the

payments from the Debtor. However, P&M Brick's role does not fall within the parameters of a

mere conduit. P&M Brick has not established any agency relationships.[28] Moreover, in its

answer to the Trustee's Request for Admissions, P&M Brick admitted (among other things) that

(i) it's bank account was maintained solely in its name, (ii) it deposited funds into its account

from sources other than the Debtor, and (iii) P&M Brick had no written agreements with third

parties or the Debtor obligating it to segregate funds, hold funds in escrow or hold funds in trust

that it received from the Debtor for the benefit of any third parties.[29]

The Debtor transferred money to P&M Brick in exchange for limestone on four

occasions during the Preference Period.[30]  P&M Brick was free to do what it pleased with the

---

[27] *Official Comm. of Unsecured Creditors v. U.S. Relocation Servs. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 202 (Bankr. S.D.N.Y. 2005) (holding that the reimbursement relationship between the debtors and the transferee precluded a "mere conduit" defense). *See also Morris v. Sampson Travel Agency, Inc. (In re U.S. Interactive Corp.)*, 321 B.R. 388, 395 (Bankr. D. Del. 2005) (permitting the recovery of transfers from a travel agent who received payments from the debtor, deposited them into its general operating account, and distributed the money as it saw fit); *Richardson v. I.R.S. (In re Anton Noll, Inc.)*, 277 B.R. 875, 880–81 (1st Cir. BAP 2002) (holding that defendant gained dominion and control upon delivery of a check payable to "cash" because the check became negotiable upon the defendant's receipt); *Meininger v. TMG Staffing Servs., Inc. (In re Cypress Rests. of Ga., Inc.)*, 332 B.R. 60, 62–66 (Bankr. M.D. Fla. 2005) (rejecting the "mere conduit" defense where debtor reimbursed a staffing agency for wages it paid in advance to staff employees because the agency's obligation to pay the employees arose regardless of whether the debtor reimbursed it; the monies reimbursed did not simply flow through to the employees).

[28] Even if an agency relationship was established, "[c]ourts have held that the existence of a principal-agent relationship is not dispositive in establishing the "mere conduit" defense." *Lenox*, 343 B.R. at 105 (citing *360networks*, 338 B.R. at 203 n. 10; *Finley, Kumble, Wagner, Heine, Underberg, Manley, Myerson & Casey v. Alexander & Alexander of New York, Inc.*, 130 F.3d 52, 58-59 (2d Cir. 1997)).

[29] First Gutfleish Certification, Ex. H, Ans. 21 - 86.

[30] The Debtor paid invoice numbers 4712 and 4722 by wire transfer from the Disbursement Account on November 5, 2010, which was received and deposited into P&M Brick's business checking account.

proceeds from that sale. P&M Brick chose to pay a portion of the proceeds to the supplier who

supplied the limestone, the trucker who transported the limestone, and the barging companies

who barged the limestone. That P&M Brick paid those entities *after* receiving payment from the

Debtor, without more, does not establish that P&M acted as a mere conduit of those funds from

the Debtor to P&M Brick's supplier and shipping companies. P&M Brick has failed to

demonstrate that it lacked dominion and control over the proceeds of the limestone sales.

Therefore, the mere conduit defense is not available to P&M Brick.

2.    Ordinary Course of Business Defense

Under Bankruptcy Code § 547(c)(2), a transfer is not avoidable if:

> such transfer was in payment of a debt incurred by the debtor in the ordinary course
> of business or financial affairs of the debtor and the transferee, and such transfer
> was (A) made in the ordinary course of business of the debtor and transferee, or
> (B) made according to ordinary business terms.[31]

The language of the statute is disjunctive. A party may establish an ordinary course of business

defense by meeting *either* the § 547(c)(2)(A) or § 547(c)(2)(B) standard.[32]

The policies underlying the ordinary course of business defense are two-fold: (1) to

encourage creditors to continue dealing with distressed debtors on normal business terms, and

(2) to promote equality of distribution by ensuring that creditors are treated equitably.[33] The

ordinary course of business defense "was intended to 'leave undisturbed normal financial

relations, because it does not detract from the general policy of the preference section to

---

The Debtor paid invoice number 5131 by wire transfer from the Disbursement Account on December 20,
2010, which was received and deposited into P&M Brick's business account. All of the invoices direct that
the payment shall be made payable to "P&M Brick, LCC."

[31]  11 U.S.C. § 547(c)(2)(A)–(B).

[32]  *In re Conex Holdings, LLC*, 518 B.R. 269, 279 (Bankr. D. Del. 2014).

[33]  *See Molded Acoustical*, 18 F.3d at 219.

discourage unusual action by either the debtor or his creditors during the debtor's slide into bankruptcy.'"[34]

a.    Objective Test

The "objective" test in 547(c)(2)(B) focuses on general norms within the creditor's industry.[35] P&M Brick relies on Mr. Schaeffer's expert reports in support of its objective ordinary course of business defense. The Trustee seeks to exclude these reports as unreliable and irrelevant. Thus, as a threshold matter, the Court must decide their admissibility.

(i)    *Mr. Schaeffer's Expert Reports*[36]

To prepare his reports, Mr. Schaeffer reviewed information and documents received from P&M Brick, as well as the company's website, to determine (i) P&M Brick's industry, (ii) the number of days before P&M Brick received payment on its invoices, and (iii) Risk Management Association ("RMA") data[37] on payment practices for companies in P&M Brick's industry.[38] Mr.

---

[34] *Union Bank v. Wolas*, 502 U.S. 151, 160 (1991) (quoting H.R.Rep. No. 95–595, at 373 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6329).

[35] *In re Molded Acoustical Prod., Inc.*, 18 F.3d 217 (3d Cir. 1994).

[36] The first of Mr. Schaeffer's reports, which was timely submitted, included data on just two industries: the Crushed and Broken Limestone Mining and Quarrying Industry and the Marine Cargo Handling Industry. The second report, which was untimely, included data on the above industries, as well as the Brick, Stone, and Related Construction Material Merchant Wholesalers Industry. The reports are otherwise the same. The Trustee argues that both reports should be excluded under Federal Rule of Evidence 702, and does not press a timeliness objection. There was no prejudice by the late filing, as the Trustee has taken the opportunity to examine and address each report in his pleadings. Thus, I will not exclude the second report for being untimely.

[37] "The Risk Management Association (RMA) is a not-for-profit, member-driven professional association whose sole purpose is to advance the use of sound risk principles in the financial services industry. RMA promotes an enterprise approach to risk management that focuses on credit risk, market risk, and operational risk." First Gutfleish Certification (Adv. D.I. 63), Ex. R at 4.

[38] *See* Schaeffer Aff. On October 16, 2014, P&M Brick submitted the Schaeffer Affidavit in connection with its Motion for Summary Judgment. The Trustee separately moves to strike the Schaeffer Affidavit, arguing that it is a disguised response to the Trustee's Motion for Summary Judgment and Motion to Exclude, which were fully briefed as of the date the Notice of Completion of Briefing was filed on October 10, 2014. The Court disagrees. The Affidavit responds to credibility issues raised in the Trustee's Answer to P&M Brick's Motion, and is admitted for that limited purpose. For the sake of equity, the Court also considers the Trustee's Sur-Reply to P&M Brick's Motion.

Schaeffer reviewed three industries that were appropriate comparisons for the sales made by P&M Brick to the Debtor during the Preference Period: the "Crushed and Broken Limestone Mining and Quarrying Industry," the "Marine Cargo Handling Industry," and the "Brick, Stone, and Related Construction Material Merchant Wholesalers Industry."[39] For each, he looked at the average days to be paid as reported by the RMA. Then he compared each industry's middle 50% average payment range to the actual payment range of invoices during the Preference Period. Mr. Schaeffer stated that using the RMA industry *averages* as a benchmark—rather than each industry's *actual* payment range—resulted in a more conservative, restrictive spread. This is because an average includes data points (actual invoices paid) above and below it. Thus an actual payment spread would be wider and less conservative than the average payment spread provided by the RMA.[40]

For each industry, the payment data reviewed fell within a date range of April 1, 2010 to March 31, 2011; thus, the RMA data covered the Preference Period. For the Crushed and Broken Limestone Mining and Quarrying Industry, the average number of days for payment (based on a review of 64 financial statements) reflected a low of 26 days to a high of 50 days. For the Marine Cargo Handling Industry, the average number of days for payment (based on a review of 86 financial statements) reflected a low of 27 days to a high of 58 days. The data for the Brick, Stone, and Related Construction Material Merchant Wholesalers Industry reflected an average payment range of 23 to 52 days based on a review of 267 financial statements.[41]

---

[39] First Gutfleish Certification (Adv. D.I. 63), Exs. O, P.

[40] "As stated by RMA, this range of average days to be paid equates to the middle quartiles (50%) of all average days to be paid data compiled for this industry. Data that is outside of this range is considered 'unusual'." First Gutfleish Certification, Ex. O, at 4.

[41] First Gutfleish Certification, Exs. O, P.

The actual payment range for the Debtor's payments to P&M Brick during the Preference Period was between 27 and 45 days. Therefore, the paid invoices fell within the average payment range for each RMA industry analyzed. Mr. Schaefer concluded,

> [E]ven taking a very conservative view of the objective prong of ordinary course of business defense using only [each] industry's middle 50% average payment range . . . the invoices at issue in this Adversary Proceeding were paid within this range, leaving a potential preference amount of $0.00 due to the Debtors' estates.[42]

### (ii)    *Admissibility of the Expert Reports Under Fed. R. Evid. 702*

Federal Rule of Evidence 702 sets the standard for the admission of expert reports and testimony:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[43]

In summary, Rule 702 requires expert testimony to be both reliable and relevant.[44] The party offering the expert has the burden of establishing the admissibility requirements by a preponderance of the evidence.[45]

---

[42] First Gutfleish Certification Exs. O, P

[43] Fed. R. Evid. 702.

[44] *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 2799, 125 L.Ed.2d 469 (1993) (stating the Federal Rules of Evidence "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.").

[45] *Id.* at 592 n. 10 (citing *Bourjaily v. United States,* 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987)).

The Third Circuit joins other jurisdictions in taking a liberal view on the admission of expert testimony: "The Rules of Evidence embody a strong and undeniable preference for admitting any evidence which has the potential for assisting the trier of fact."[46] This position is supported in the Committee Notes on the 2000 Amendments to the Federal Rules of Evidence, which state, "the rejection of expert testimony is the exception rather than the rule."

In this case, P&M Brick seeks to use Mr. Schaeffer's expert testimony to support its ordinary course of business defense.[47] According to Mr. Schaeffer, the RMA data establish industry standards on payment practices. Mr. Schaeffer maintains the transfers from the Debtor to P&M Brick fell within the average payment range for each relevant industry, and, therefore, were made in accordance with ordinary business terms and are not avoidable.

The Trustee seeks to exclude Mr. Schaeffer's reports as unreliable and irrelevant. Specifically, the Trustee takes issue with Mr. Schaeffer's exclusive reliance on RMA data. The RMA says its data should be used "only as general guidelines and not as absolute industry norms," and may contain outliers that can cause "a disproportionate influence on the industry composite." The Trustee further argues that Mr. Schaeffer did not know if the sampling of firms in each industry was too small to be representative of the industry as a whole. Additionally, Mr. Schaeffer does not identify the rate of error as applied to the data. Further, RMA data comes from anonymous companies. The Trustee concludes that these deficiencies make the RMA data untestable, and, therefore, unreliable.

In determining the reliability of scientific evidence, courts consider factors set forth by the United States Supreme Court in *Daubert*: (1) whether the expert's hypothesis can be and has been tested; (2) whether the methodology has been subjected to peer review and publication;

---

[46] *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802 (3d Cir. 1997), *as amended* (Dec. 12, 1997).
[47] There is no objection to Mr. Schaeffer's qualifications.

(3) the frequency of erroneous results; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique generally has been accepted in the scientific community.[48] The inquiry, however, is a flexible one, and courts may look beyond these factors to assess reliability.[49] *Daubert* emphasizes the need for flexibility, stating that its factors are neither exclusive nor dispositive.[50]

Other courts have determined that opinions based on data from the Risk Management Association is reliable. In *Dietz v. Jacobs*, when an expert relied on RMA data, his opinion was admissible as to payment practices in the defendants' industry.[51] Although an RMA publication cautioned that its statistics were "general guidelines" rather than "absolute industry norms," the same publication also claimed that the RMA was the "most respected source" of industry information.[52] The RMA warned that its data might not be fully representative of a given industry; however, there was nothing to suggest any issues with the specific data set in that case. The court concluded that the expert's testimony, based only on RMA statistics, was not "so fundamentally unsupported" that it had to be excluded.[53]

In *Blue Cross & Blue Shield of Minnesota v. Wells Fargo Bank, N.A.*, the court considered testimony based on RMA data, calculating each plaintiff's economic loss in the defendant's securities lending program.[54] The expert compared actual losses to those of a

---

[48] *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3d Cir. 1994) (summarizing the *Daubert* test).

[49] *Id.*; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Kannankeril*, 128 F.3d 802, 806-07 (3d Cir. 1997) (stating "these factors are neither exhaustive nor applicable in every case.").

[50] *See Daubert*, 509 U.S. at 594. (stating "[t]he inquiry envisioned by Rule 702 is, we emphasize, a flexible one.").

[51] 2014 WL 1153502, at *1 (D. Minn. Mar. 21, 2014).

[52] *Id.* at *4.

[53] *Id.* (quoting *Bonner v. Isp Techs*, 259 F.3d 924, 929-30 (8th Cir. 2001)).

[54] 2013 WL 2434838 (D. Minn. June 4, 2013).

hypothetical investment pool facing similar economic conditions.[55] In constructing the

hypothetical portfolio, the expert pulled RMA data from 15-20 securities lending

intermediaries.[56] The plaintiffs argued that the investments selected by the defendant's expert did

not meet the "prudent" investor standard and were inappropriate as a benchmark.[57] Therefore,

the plaintiffs asserted that the expert's testimony was unreliable.[58] The court ruled to admit,

concluding that such testimony should be excluded only if it "is so fundamentally unsupported

that it can offer no assistance."[59]

The *Daubert* reliability factors weigh in favor of admitting Mr. Schaeffer's testimony. To

begin, Mr. Schaeffer's conclusion - - that P&M Brick's payment practices are consistent with

industry norms - - can be tested. In the Reports, Mr. Schaeffer explained the formulas and

statistical analysis he relied on in reaching his conclusions. The second factor, whether a

methodology has been peer reviewed or published, is addressed in the introduction to the RMA

Annual Statement Studies: Financial Ratio Benchmarks, which states that "[f]or over 94 years,

RMA's *Annual Statement Studies* has been the industry standard for comparison financial

data."[60]  Third, as to the frequency of error, Mr. Schaeffer sets his benchmark as the middle 50%

of average days to be paid. Regarding sample size, Mr. Schaeffer noted that RMA does not offer

data when there are fewer than 10 financial statements in a group.[61] The analysis of the Crushed

and Broken Limestone Mining and Quarrying Industry consisted of 64 statements. There were 97

statements for the Marine Cargo Handling Industry and 267 statements for the Brick, Stone, and

---

[55] *Id.* at *4.
[56] *Id.*
[57] *Id.* at *8.
[58] *Id.*
[59] *Id.* (quoting *Bonner*, 259 F.3d at 929-30).
[60] First Gutfleish Certification (Adv. D.I. 63), Ex. R at 9.
[61] First Gutfleish Certification, Ex. Q, at 68:3 - 9; Ex. R at 10;

Related Construction Material Merchant Wholesalers Industry. These checks also speak to the fourth factor, regarding standards to control the technique's operation. Finally, other courts have admitted RMA data, which is sufficient evidence that it is generally accepted.

In addition to meeting the reliability requirement, expert testimony must also be relevant. That is, it must "help the trier of fact to understand the evidence or to determine a fact in issue."[62] This inquiry speaks to the "fit" between the expert's conclusions and the case at hand. Though higher than bare relevance, it is a permissive standard.[63]

The Trustee argues that the RMA data does not fit the facts in this adversary proceeding and, therefore, is not relevant. First, the Trustee contends that the industries examined are not relevant to P&M Brick's business. P&M Brick's primary business is stevedoring, which involves loading and unloading ship cargo. According to the Trustee, these activities do not put P&M Brick in the Crushed and Broken Limestone Mining and Quarrying Industry, or the Brick, Stone, and Related Construction Material Merchant Wholesalers Industry. The Trustee concedes that stevedoring might fall in the Marine Cargo Handling Industry, but observes that only a portion of the payments were for P&M Brick's stevedoring services.[64] The remaining payments were for P&M Brick's other services in coordinating the logistics of delivering limestone to the Debtor's facility in Connecticut. Because P&M Brick performed more than stevedoring in this instance, reference to other industries is relevant.

---

[62] Fed. R. Evid. 702.

[63] *In re Paoli*, 35 F.3d at 745 (stating "once again, we emphasize that the standard is not that high.").

[64] "Of the $607,482.63 in Transfers that the Defendant received from the Debtor, the Defendant allocated $462,412.04 to Specialty for the limestone provided, to CS&G for its trucking services, and to Eastern Barge and Mohawk for their barging services, to satisfy the Defendant's independent obligations to the Third-Parties. At best, only $215,170.59 of the Transfers were allocated to services rendered by the Defendant." Adv. D.I. 79, p. 14.

Mr. Schaeffer's analysis using RMA data to establish payment practices in the type of industries that reflect the transactions between the Debtor and P&M Brick is relevant. The data is sufficiently tested, reliable and his opinion is helpful to the Court. I will admit Mr. Schaeffer's Export Reports.

        (iii)    *Objective Test Analysis*

"Because Congress did not intend to upset commercial dealings with distressed parties, the 'ordinary business terms' test of section 547(c)(2)(B) is necessarily a broad one, and the evidentiary standard is not formidable."[65] "The creditor must simply establish a range of terms on which firms similar in some general way to the creditor deal."[66]

Defining the industry whose standard should be used for comparison is not always a simple task.[67] A creditor has considerable latitude in defining the relevant industry; however, this latitude is not without some inherent limits.[68] In *In re SGSM Acquisition Co., LLC*, the Fifth Circuit discussed the relevant test as follows:

> As to what constitutes the relevant industry, *Gulf City* held that the term ordinarily encompasses "suppliers to whom [the debtor] might reasonably turn for [similar supplies] and firms with whom [the debtor] competes for customers."[69]

---

[65] *Sass v. Vector Consulting, Inc. (In re American Home Mortg. Holdings, Inc.)*, 476 B.R. 124, (Bankr. D. Del. 2012).

[66] *Id.* (citing *Forklift Liquidating Trust v. Custom Tool & Mfg. Co. (In re Forklift LP Corp.)*, 340 B.R. 735, 739 (Bankr. D. Del. 2006) (internal punctuation omitted). *See also Molded Acoustical*, 18 F.3d at 226 (deciding that a creditor should "ensure [that] its credit terms comport with some reasonable relevant industry's norms.").

[67] *See In re Tolona Pizza Prod. Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993) (questioning whether the appropriate industry included "the [sellers] of sausages to makers of pizza? The [sellers] of sausages to anyone? The [sellers] of anything to makers of pizza?").

[68] *In re Gulf City Seafoods, Inc.*, 296 F.3d 363, 369 (5th Cir. 2002).

[69] 439 F.3d 233, 239 (5th Cir.2006) *quoting Gulf City Seafood*, 296 F.3d at 369.

From these cases, it seems clear that the applicable industry standard is to be ascertained based on the credit arrangements of other debtors and creditors in a similar market.[70]

P&M Brick relies on the Expert Reports and affidavit of Mr. Schaeffer to establish the objective ordinariness of the transactions between the Debtor and P&M Brick when compared to information available, through RMA data, for three industries. RMA data aggregates financial data of businesses in a particular industry to evaluate the strength of balance sheets or profit/loss statements. According to Mr. Schaeffer, the three industries he chose to evaluate "relate in some general way to the various aspects of the [T]ransactions."[71]

The Trustee faulted Mr. Schaeffer's analysis for failing to distinguish between P&M Brick's industry and the industries of other companies involved in the transactions. Here, the defendant coordinated multiple services necessary to the procurement of limestone. The Transfers were not made for stevedoring services only. P&M Brick argues, in response, that the challenged transactions should be evaluated "holistically," meaning that, when viewed in its entirety, the multiple services coordinated by P&M Brick are most appropriately viewed together. Consequently, since Mr. Schaeffer's opinions amply support the conclusion that the payments all fall within the industry standards of all three industries, they are not recoverable by the Trustee. I agree.

P&M Brick relies on the Expert Report's analysis to demonstrate that the number of days between invoice date and payment date during the preference period (between 27 and 45 days) fell within the payment range of all three industries that were reviewed. The Trustee also argues that the RMA data do not actually measure the number of days from invoice to payment. Instead, the Trustee notes that RMA explains that "its receivable data and related ratios are an attempt to

---

[70] *See Gulf City Seafoods,* 296 F.3d at 369.
[71] Affidavit of Harold Schaeffer ¶ 10 (Adv. D.I. 82).

measure receivable turnover over the course of a given period, and that it merely provides a snapshot of one day's receivables to total annual sales."[72]

In *Molded Acoustical,* the Third Circuit agreed with the Seventh Circuit's decision that "'ordinary business terms' refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary."[73] "Precise data is not necessary to prove ordinary business terms within a creditors' industry."[74] While it may not be precise, I find the expert's reliance on the RMA data to be reasonable and appropriate here. On the record before me, I conclude that P&M Brick has demonstrated that the Transfers fall within ordinary business terms.

    b.    <u>Subjective Test</u>

Bankruptcy Code § 547(c)(2)(A) also presents a "subjective" test to determine whether payments were consistent with prior dealings of the parties.[75] As part of this inquiry, courts consider the following five factors: (1) the length of time the parties have engaged in the type of dealing at issue; (2) whether the subject transfers were in amounts more than usually paid; (3) whether the payments were tendered in a manner different from previous payments; (4) whether there appears any unusual action by either the debtor or creditor to collect or pay on the debt; and (5) whether the creditor did anything to gain an advantage (such as gain additional security) in

---

[72] Trustee's Sur-reply (Adv. D.I. 84) at 10.

[73] *Molded Acoustical,* 18 F.3d at 220 (emphasis in original) (citing *Tolona Pizza,* 3 F.3d at 1033).

[74] *American Mortg,* 476 B.R. at 141 (citing *Hechinger Liquidation Trust v. James Austin Co. (In re Hechinger Inv. Co. of Delaware, Inc.),* 320 B.R. 541, 550 (Bankr. D. Del. 2004).

[75] *SEC v. First Jersey Sec., Inc. (In re First Jersey Sec., Inc.),* 180 F.3d 504, 512 (3d Cir.1999) (stating *"J.P. Fyfe* teaches the determination of what is 'in the ordinary course of business' is subjective, calling for the Court to consider whether the transfer was ordinary as between the debtor and the creditor.").

light of the debtor's deteriorating financial condition.[76] However, no single factor is

determinative.[77]

Because the subjective analysis reviews the history of transactions between the parties, a

problem arises when, as here, the parties have a very short history of dealing. The Third Circuit

previously addressed this problem as follows:

> [W]hen the relationship in question has been cemented long before the onset of
> insolvency-up through and including the preference period-we should pause and
> consider carefully before further impairing a creditor whose confident, consistent,
> ordinary extension of trade credit has given the straitened debtor a fighting chance
> of sidestepping bankruptcy and continuing in business. Bankruptcy policy, as
> evidenced by the very existence of § 547(c)(2), is to promote such continuing
> relationships on level terms, relationships which if encouraged will often help
> businesses fend off an unwelcome voyage into the labyrinths of a bankruptcy. *See*
> *O'Neill v. Nestle Libbys P.R., Inc.,* 729 F.2d 35, 37 (1st Cir.1984) (noting the
> exception encourages creditors to continue conducting business with struggling
> creditors); *cf. In re Hoffman,* 12 F.3d at 1553. On the other hand, where the
> relationship is of recent origin, a significant departure from credit terms normal to
> the trade bears the earmarks of favoritism and/or exploitation, and to countenance
> such behavior could be unfair (or could appear unfair) to the remaining creditors
> who exhibit the virtue of patience.
>
> With all that said, we adopt the following rule of construction as an aid to
> resolving these problems: the more cemented (as measured by its duration) the
> pre-insolvency relationship between the debtor and the creditor, the more the
> creditor will be allowed to vary its credit terms from the industry norm yet remain
> within the safe harbor of § 547(c)(2). The likelihood of unfair overreaching by a
> creditor (to the disadvantage of other creditors) is reduced if the parties sustained
> the same relationship for a substantial time frame prior to the debtor's insolvency.
> After all, if at the starting point of the relationship insolvency was a distant
> prospect, a trade creditor does not unfairly overreach, impel insolvency, or
> inequitably advantage itself at other creditors' expense by tolerating more generous
> or commanding more stringent repayment schedules than its competitors.[78]

---

[76] *In re Hayes Lemmerz Int'l, Inc.,* 339 B.R. 97, 106 (Bankr. D. Del. 2006) (citing *In re Allegheny Health, Educ. & Research Found.,* 292 B.R. 68, 79 (Bankr. W.D. Pa. 2003)).

[77] *Conex,* 518 B.R. at 280.

[78] *Molded Acoustical,* 18 F.3d at 224-25.

The ordinary course of business test has changed since the Third Circuit decided *Molded Acoustical.* As explained by the *Conex* Court:

> The problem, however, is that this case law was developed at a time when the defense required a showing that the transfer was **both** in the ordinary course of the parties' relationship **and** under industry norms. Thus, it was logical to require a more stringent showing of the second factor of a two-part test when evidence relating to the first part of the test was incomplete or absent. But, there is no longer a two-part test. Since the amendment of the statute in 2005 under BAPCPA, the elements have been independent. To require a defendant to show that transfers were made under industry norms to establish that the transfers were made in the ordinary course of the parties' relationship would be to rewrite the statute to its pre–2005 terms. To be consistent with the current statutory structure, the Court cannot import the industry practice into its review of the parties' business relationship. The Court must do the best it can with the evidence before it as to the parties' relationship. Moreover, under the current statute it would be inappropriate to subject the evidence of industry norms to stricter scrutiny because the parties' business relationship has been for a relatively short time.[79]

Our case is easier than *Conex,* because I have determined that P&M Brick meets the ordinary business terms test, even though both objective and subjective factors are not required. This means that I can review the short history between the Debtor and P&M Brick less stringently.

The following table summarizes receipt of the payments during the entire length of the party's business relationship. Those received during the Preference Period are bolded. Each invoice calls for payment within 30 days.

| Invoice # | Invoice Date | Date Paid | Paid Amount | Days to Pay |
|---|---|---|---|---|
| 2872 | 11/23/09 | 12/31/09 | $107,692.59 | 38 |
| 4163 | 07/09/10 | 08/20/10 | $205,652.20 | 42 |
| **4712** | **09/30/10** | **11/05/10** | **$108,218.83** | **36** |
| **4722** | **09/30/10** | **11/05/10** | **$99,481.20** | **36** |
| **4990** | **10/30/10** | **12/14/10** | **$221,119.50** | **45** |
| **5131** | **11/23/10** | **12/20/10** | **$248,663.10** | **27** |

[79] *Conex*, 518 B.R. at 282 (footnotes omitted).

The entire business relationship between P&M Brick and Debtor spanned approximately 13 months, from the date of P&M Brick's first invoice through the last payment received from the Debtor. During the pre-preference period, the payment range from date of invoice to date of payment is between 38 and 42 days. The Preference Period payment range is between 27 and 45 days. The Debtor paid only the amount due with respect to each invoice from P&M Brick, and the method of payment was consistent. There is no evidence that P&M Brick applied undue pressure or collection activity against the Debtor either before or during the Preference Period. Citing this evidence, P&M Brick argues that payments during the Preference Period were made within the ordinary course of business of the Debtor and P&M Brick.

Based on these facts and the record before me, I conclude that P&M Brick also meets the subjective test for the ordinary course of business defense.

Conclusion

For the reasons stated above, I conclude that:

(1)    the Trustee's Motion for Summary Judgment will be granted, in part, as to P&M Brick's mere conduit defense;

(2)    the Trustee's Motion to Exclude Expert Reports will be denied; and

(3)    P&M Brick's Motion for Summary Judgment as to its ordinary course of business defense will be granted.

An appropriate Order follows.

BY THE COURT:

_____
KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT

DATED:  October 28, 2016